# GILMER *v.* INTERSTATE/JOHNSON LANE CORP.

No. 90–18.   Argued January 14, 1991—Decided May 13, 1991

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, O'CONNOR, SCALIA, KENNEDY, and SOUTER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 36.

*John T. Allred* argued the cause and filed a brief for petitioner.

*James B. Spears, Jr.*, argued the cause for respondent. With him on the brief was *Robert S. Phifer.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Retired Persons by *Cathy Ventrell-Monsees* and *Robert L. Liebross;* and for the American Federation of Labor and Congress of Industrial Organizations by *Laurence Gold* and *Marsha S. Berzon.*

Briefs of *amici curiae* urging affirmance were filed for the Center for Public Resources, Inc., by *Jay W. Waks;* for the Chamber of Commerce of the United States of America by *Peter G. Nash, Dixie L. Atwater, Michael J. Murphy,* and *Stephen A. Bokat;* for the Equal Employment Advisory Council et al. by *Robert E. Williams, Douglas S. McDowell, Ann Elizabeth Reesman,* and *Donald L. Goldman;* for the Lawyers' Committee for Civil Rights Under Law by *Alan E. Kraus, Nicholas deB. Katzenbach, Robert F. Mullen, David S. Tatel, Thomas J. Henderson,* and *Richard*

JUSTICE WHITE delivered the opinion of the Court.

The question presented in this case is whether a claim under the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.*, can be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application. The Court of Appeals held that it could, 895 F. 2d 195 (CA4 1990), and we affirm.

I

Respondent Interstate/Johnson Lane Corporation (Interstate) hired petitioner Robert Gilmer as a Manager of Financial Services in May 1981. As required by his employment, Gilmer registered as a securities representative with several stock exchanges, including the New York Stock Exchange (NYSE). See App. 15–18. His registration application, entitled "Uniform Application for Securities Industry Registration or Transfer," provided, among other things, that Gilmer "agree[d] to arbitrate any dispute, claim or controversy" arising between him and Interstate "that is required to be arbitrated under the rules, constitutions or by-laws of the organizations with which I register." *Id.*, at 18. Of relevance to this case, NYSE Rule 347 provides for arbitration of "[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative." App. to Brief for Respondent 1.

Interstate terminated Gilmer's employment in 1987, at which time Gilmer was 62 years of age. After first filing an age discrimination charge with the Equal Employment Opportunity Commission (EEOC), Gilmer subsequently brought suit in the United States District Court for the Western District of North Carolina, alleging that Interstate had discharged him because of his age, in violation of the

*T. Seymour;* and for the Securities Industry Association, Inc., by *A. Robert Pietrzak* and *William J. Fitzpatrick.*

ADEA. In response to Gilmer's complaint, Interstate filed in the District Court a motion to compel arbitration of the ADEA claim. In its motion, Interstate relied upon the arbitration agreement in Gilmer's registration application, as well as the Federal Arbitration Act (FAA), 9 U. S. C. § 1 *et seq.* The District Court denied Interstate's motion, based on this Court's decision in *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36 (1974), and because it concluded that "Congress intended to protect ADEA claimants from the waiver of a judicial forum." App. 87. The United States Court of Appeals for the Fourth Circuit reversed, finding "nothing in the text, legislative history, or underlying purposes of the ADEA indicating a congressional intent to preclude enforcement of arbitration agreements." 895 F. 2d, at 197. We granted certiorari, 498 U. S. 809 (1990), to resolve a conflict among the Courts of Appeals regarding the arbitrability of ADEA claims.[1]

## II

The FAA was originally enacted in 1925, 43 Stat. 883, and then reenacted and codified in 1947 as Title 9 of the United States Code. Its purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts. *Dean Witter Reynolds Inc.* v. *Byrd,* 470 U. S. 213, 219–220, and n. 6 (1985); *Scherk* v. *Alberto-Culver Co.,* 417 U. S. 506, 510, n. 4 (1974). Its primary substantive provision states that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of

---

[1] Compare the decision below with *Nicholson* v. *CPC Int'l Inc.,* 877 F. 2d 221 (CA3 1989).

any contract." 9 U. S. C. §2. The FAA also provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, §3, and for orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement, §4. These provisions manifest a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 24 (1983).[2]

---

[2] Section 1 of the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U. S. C. §1. Several *amici curiae* in support of Gilmer argue that that section excludes from the coverage of the FAA *all* "contracts of employment." Gilmer, however, did not raise the issue in the courts below; it was not addressed there; and it was not among the questions presented in the petition for certiorari. In any event, it would be inappropriate to address the scope of the §1 exclusion because the arbitration clause being enforced here is not contained in a contract of employment. The FAA requires that the arbitration clause being enforced be in writing. See 9 U. S. C. §§2, 3. The record before us does not show, and the parties do not contend, that Gilmer's employment agreement with Interstate contained a written arbitration clause. Rather, the arbitration clause at issue is in Gilmer's securities registration application, which is a contract with the securities exchanges, not with Interstate. The lower courts addressing the issue uniformly have concluded that the exclusionary clause in §1 of the FAA is inapplicable to arbitration clauses contained in such registration applications. See, *e. g.*, *Dickstein* v. *DuPont*, 443 F. 2d 783 (CA1 1971); *Malison* v. *Prudential-Bache Securities, Inc.*, 654 F. Supp. 101, 104 (WDNC 1987); *Legg, Mason & Co.* v. *Mackall & Coe, Inc.*, 351 F. Supp. 1367 (DC 1972); *Tonetti* v. *Shirley*, 219 Cal. Rptr. 616, 618, 173 Cal. App. 3d 1144 (1985); see also *Stokes* v. *Merrill Lynch, Pierce, Fenner & Smith*, 523 F. 2d 433, 436 (CA6 1975). We implicitly assumed as much in *Perry* v. *Thomas*, 482 U. S. 483 (1987), where we held that the FAA required a former employee of a securities firm to arbitrate his statutory wage claim against his former employer, pursuant to an arbitration clause in his registration application. Unlike the dissent, see *post*, at 38–41, we choose to follow the plain language of the FAA and the weight of authority, and we therefore hold that §1's exclusionary clause does not apply to Gilmer's arbitration agreement. Consequently, we leave for another day the issue raised by *amici curiae*.

It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA. Indeed, in recent years we have held enforceable arbitration agreements relating to claims arising under the Sherman Act, 15 U. S. C. §§ 1–7; § 10(b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78j(b); the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. § 1961 *et seq.;* and § 12(2) of the Securities Act of 1933, 15 U. S. C. § 77*l*(2). See *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.,* 473 U. S. 614 (1985); *Shearson/American Express Inc.* v. *McMahon,* 482 U. S. 220 (1987); *Rodriguez de Quijas* v. *Shearson/ American Express, Inc.,* 490 U. S. 477 (1989). In these cases we recognized that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi,* 473 U. S., at 628.

Although all statutory claims may not be appropriate for arbitration, "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Ibid.* In this regard, we note that the burden is on Gilmer to show that Congress intended to preclude a waiver of a judicial forum for ADEA claims. See *McMahon,* 482 U. S., at 227. If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an "inherent conflict" between arbitration and the ADEA's underlying purposes. See *ibid.* Throughout such an inquiry, it should be kept in mind that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone, supra,* at 24.

### III

Gilmer concedes that nothing in the text of the ADEA or its legislative history explicitly precludes arbitration. He

argues, however, that compulsory arbitration of ADEA claims pursuant to arbitration agreements would be inconsistent with the statutory framework and purposes of the ADEA. Like the Court of Appeals, we disagree.

## A

Congress enacted the ADEA in 1967 "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U. S. C. § 621(b). To achieve those goals, the ADEA, among other things, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." § 623(a)(1). This proscription is enforced both by private suits and by the EEOC. In order for an aggrieved individual to bring suit under the ADEA, he or she must first file a charge with the EEOC and then wait at least 60 days. § 626(d). An individual's right to sue is extinguished, however, if the EEOC institutes an action against the employer. § 626(c)(1). Before the EEOC can bring such an action, though, it must "attempt to eliminate the discriminatory practice or practices alleged, and to effect voluntary compliance with the requirements of this chapter through informal methods of conciliation, conference, and persuasion." § 626(b); see also 29 CFR § 1626.15 (1990).

As Gilmer contends, the ADEA is designed not only to address individual grievances, but also to further important social policies. See, e. g., EEOC v. Wyoming, 460 U. S. 226, 231 (1983). We do not perceive any inherent inconsistency between those policies, however, and enforcing agreements to arbitrate age discrimination claims. It is true that arbitration focuses on specific disputes between the parties in-

volved. The same can be said, however, of judicial resolution of claims. Both of these dispute resolution mechanisms nevertheless also can further broader social purposes. The Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities Act of 1933 all are designed to advance important public policies, but, as noted above, claims under those statutes are appropriate for arbitration. "[S]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function." *Mitsubishi, supra,* at 637.

We also are unpersuaded by the argument that arbitration will undermine the role of the EEOC in enforcing the ADEA. An individual ADEA claimant subject to an arbitration agreement will still be free to file a charge with the EEOC, even though the claimant is not able to institute a private judicial action. Indeed, Gilmer filed a charge with the EEOC in this case. In any event, the EEOC's role in combating age discrimination is not dependent on the filing of a charge; the agency may receive information concerning alleged violations of the ADEA "from any source," and it has independent authority to investigate age discrimination. See 29 CFR §§ 1626.4, 1626.13 (1990). Moreover, nothing in the ADEA indicates that Congress intended that the EEOC be involved in all employment disputes. Such disputes can be settled, for example, without any EEOC involvement. See, *e. g., Coventry* v. *United States Steel Corp.,* 856 F. 2d 514, 522 (CA3 1988); *Moore* v. *McGraw Edison Co.,* 804 F. 2d 1026, 1033 (CA8 1986); *Runyan* v. *National Cash Register Corp.,* 787 F. 2d 1039, 1045 (CA6), cert. denied, 479 U. S. 850 (1986).[3] Finally, the mere involvement of an administrative

---

[3] In the recently enacted Older Workers Benefit Protection Act, Pub. L. 101–433, 104 Stat. 978, Congress amended the ADEA to provide that "[a]n individual may not waive any right or claim under this Act unless the waiver is knowing and voluntary." See § 201. Congress also specified

agency in the enforcement of a statute is not sufficient to preclude arbitration. For example, the Securities Exchange Commission is heavily involved in the enforcement of the Securities Exchange Act of 1934 and the Securities Act of 1933, but we have held that claims under both of those statutes may be subject to compulsory arbitration. See *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220 (1987); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477 (1989).

Gilmer also argues that compulsory arbitration is improper because it deprives claimants of the judicial forum provided for by the ADEA. Congress, however, did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADEA. "[I]f Congress intended the substantive protection afforded [by the ADEA] to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history." *Mitsubishi*, 473 U. S., at 628. Moreover, Gilmer's argument ignores the ADEA's flexible approach to resolution of claims. The EEOC, for example, is directed to pursue "informal methods of conciliation, conference, and persuasion," 29 U. S. C. § 626(b), which suggests that out-of-court dispute resolution, such as arbitration, is consistent with the statutory scheme established by Congress. In addition, arbitration is consistent with Congress' grant of concurrent jurisdiction over ADEA claims to state and federal courts, see 29 U. S. C. § 626(c)(1) (allowing suits to be brought "in any court of competent jurisdiction"), because arbitration agreements, "like the provision for concurrent jurisdiction, serve to advance the objective of allowing [claimants] a broader right to select the forum for resolving disputes, whether it be judicial or otherwise." *Rodriguez de Quijas, supra,* at 483.

---

certain conditions that must be met in order for a waiver to be knowing and voluntary. *Ibid.*

## B

In arguing that arbitration is inconsistent with the ADEA, Gilmer also raises a host of challenges to the adequacy of arbitration procedures. Initially, we note that in our recent arbitration cases we have already rejected most of these arguments as insufficient to preclude arbitration of statutory claims. Such generalized attacks on arbitration "res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants," and as such, they are "far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Rodriguez de Quijas, supra,* at 481. Consequently, we address these arguments only briefly.

Gilmer first speculates that arbitration panels will be biased. However, "[w]e decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators." *Mitsubishi, supra,* at 634. In any event, we note that the NYSE arbitration rules, which are applicable to the dispute in this case, provide protections against biased panels. The rules require, for example, that the parties be informed of the employment histories of the arbitrators, and that they be allowed to make further inquiries into the arbitrators' backgrounds. See 2 CCH New York Stock Exchange Guide ¶ 2608, p. 4314 (Rule 608) (1991) (hereinafter 2 N. Y. S. E. Guide). In addition, each party is allowed one peremptory challenge and unlimited challenges for cause. *Id.,* ¶ 2609, at 4315 (Rule 609). Moreover, the arbitrators are required to disclose "any circumstances which might preclude [them] from rendering an objective and impartial determination." *Id.,* ¶ 2610, at 4315 (Rule 610). The FAA also protects against bias, by providing that courts may overturn arbitration decisions "[w]here there was evident partiality or corruption in the arbitrators." 9 U. S. C.

§ 10(b). There has been no showing in this case that those provisions are inadequate to guard against potential bias.

Gilmer also complains that the discovery allowed in arbitration is more limited than in the federal courts, which he contends will make it difficult to prove discrimination. It is unlikely, however, that age discrimination claims require more extensive discovery than other claims that we have found to be arbitrable, such as RICO and antitrust claims. Moreover, there has been no showing in this case that the NYSE discovery provisions, which allow for document production, information requests, depositions, and subpoenas, see 2 N. Y. S. E. Guide ¶ 2619, pp. 4318–4320 (Rule 619); Securities and Exchange Commission Order Approving Proposed Rule Changes by New York Stock Exchange, Inc., Nat. Assn. of Securities Dealers, Inc., and the American Stock Exchange, Inc., Relating to the Arbitration Process and the Use of Predispute Arbitration Clauses, 54 Fed. Reg. 21144, 21149–21151 (1989), will prove insufficient to allow ADEA claimants such as Gilmer a fair opportunity to present their claims. Although those procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Mitsubishi, supra,* at 628. Indeed, an important counterweight to the reduced discovery in NYSE arbitration is that arbitrators are not bound by the rules of evidence. See 2 N. Y. S. E. Guide ¶ 2620, p. 4320 (Rule 620).

A further alleged deficiency of arbitration is that arbitrators often will not issue written opinions, resulting, Gilmer contends, in a lack of public knowledge of employers' discriminatory policies, an inability to obtain effective appellate review, and a stifling of the development of the law. The NYSE rules, however, do require that all arbitration awards be in writing, and that the awards contain the names of the parties, a summary of the issues in controversy, and a

description of the award issued. See *id.*, ¶¶ 2627(a), (e), at 4321 (Rules 627(a), (e)). In addition, the award decisions are made available to the public. See *id.*, ¶ 2627(f), at 4322 (Rule 627(f)). Furthermore, judicial decisions addressing ADEA claims will continue to be issued because it is unlikely that all or even most ADEA claimants will be subject to arbitration agreements. Finally, Gilmer's concerns apply equally to settlements of ADEA claims, which, as noted above, are clearly allowed.[4]

It is also argued that arbitration procedures cannot adequately further the purposes of the ADEA because they do not provide for broad equitable relief and class actions. As the court below noted, however, arbitrators do have the power to fashion equitable relief. 895 F. 2d, at 199–200. Indeed, the NYSE rules applicable here do not restrict the types of relief an arbitrator may award, but merely refer to "damages and/or other relief." 2 N. Y. S. E. Guide ¶ 2627(e), p. 4321 (Rule 627(e)). The NYSE rules also provide for collective proceedings. *Id.*, ¶ 2612(d), at 4317 (Rule 612(d)). But "even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred." *Nicholson* v. *CPC Int'l Inc.*, 877 F. 2d 221, 241 (CA3 1989) (Becker, J., dissenting). Finally, it should be remembered that arbitration agreements will not preclude the *EEOC* from bringing actions seeking class-wide and equitable relief.

## C

An additional reason advanced by Gilmer for refusing to enforce arbitration agreements relating to ADEA claims is

---

[4] Gilmer also contends that judicial review of arbitration decisions is *too* limited. We have stated, however, that "although judicial scrutiny of arbitration awards necessarily is limited, such review is sufficient to ensure that arbitrators comply with the requirements of the statute" at issue. *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 232 (1987).

his contention that there often will be unequal bargaining power between employers and employees. Mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context. Relationships between securities dealers and investors, for example, may involve unequal bargaining power, but we nevertheless held in *Rodriguez de Quijas* and *McMahon* that agreements to arbitrate in that context are enforceable. See 490 U. S., at 484; 482 U. S., at 230. As discussed above, the FAA's purpose was to place arbitration agreements on the same footing as other contracts. Thus, arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U. S. C. § 2. "Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Mitsubishi*, 473 U. S., at 627. There is no indication in this case, however, that Gilmer, an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application. As with the claimed procedural inadequacies discussed above, this claim of unequal bargaining power is best left for resolution in specific cases.

## IV

In addition to the arguments discussed above, Gilmer vigorously asserts that our decision in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974), and its progeny— *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728 (1981), and *McDonald* v. *West Branch*, 466 U. S. 284 (1984)—preclude arbitration of employment discrimination claims. Gilmer's reliance on these cases, however, is misplaced.

In *Gardner-Denver*, the issue was whether a discharged employee whose grievance had been arbitrated pursuant to

an arbitration clause in a collective-bargaining agreement was precluded from subsequently bringing a Title VII action based upon the conduct that was the subject of the grievance. In holding that the employee was not foreclosed from bringing the Title VII claim, we stressed that an employee's contractual rights under a collective-bargaining agreement are distinct from the employee's statutory Title VII rights:

> "In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence." 415 U. S., at 49–50.

We also noted that a labor arbitrator has authority only to resolve questions of contractual rights. *Id.*, at 53–54. The arbitrator's "task is to effectuate the intent of the parties" and he or she does not have the "general authority to invoke public laws that conflict with the bargain between the parties." *Id.*, at 53. By contrast, "in instituting an action under Title VII, the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process." *Id.*, at 54. We further expressed concern that in collective-bargaining arbitration "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit." *Id.*, at 58, n. 19.[5]

---

[5] The Court in *Alexander* v. *Gardner-Denver Co.* also expressed the view that arbitration was inferior to the judicial process for resolving statutory claims. 415 U. S., at 57–58. That "mistrust of the arbitral process," however, has been undermined by our recent arbitration decisions. *McMahon*, 482 U. S., at 231–232. "[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 626–627 (1985).

*Barrentine* and *McDonald* similarly involved the issue whether arbitration under a collective-bargaining agreement precluded a subsequent statutory claim. In holding that the statutory claims there were not precluded, we noted, as in *Gardner-Denver*, the difference between contractual rights under a collective-bargaining agreement and individual statutory rights, the potential disparity in interests between a union and an employee, and the limited authority and power of labor arbitrators.

There are several important distinctions between the *Gardner-Denver* line of cases and the case before us. First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements." *Mitsubishi*, 473 U. S., at 625. Therefore, those cases provide no basis for refusing to enforce Gilmer's agreement to arbitrate his ADEA claim.

## V

We conclude that Gilmer has not met his burden of showing that Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

Section 1 of the Federal Arbitration Act (FAA) states:

"[N]othing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U. S. C. § 1.

The Court today, in holding that the FAA compels enforcement of arbitration clauses even when claims of age discrimination are at issue, skirts the antecedent question whether the coverage of the Act even extends to arbitration clauses contained in employment contracts, regardless of the subject matter of the claim at issue. In my opinion, arbitration clauses contained in employment agreements are specifically exempt from coverage of the FAA, and for that reason respondent Interstate/Johnson Lane Corporation cannot, pursuant to the FAA, compel petitioner to submit his claims arising under the Age Discrimination in Employment Act of 1967 (ADEA), 29 U. S. C. § 621 *et seq.*, to binding arbitration.

I

Petitioner did not, as the majority correctly notes, *ante*, at 25, n. 2, raise the issue of the applicability of the FAA to employment contracts at any stage of the proceedings below. Nor did petitioner raise the coverage issue in his petition for writ of certiorari before this Court. It was *amici* who first raised the argument in their briefs in support of petitioner prior to oral argument of the case. See Brief for American Federation of Labor and Congress of Industrial Organizations as *Amicus Curiae*; Brief for American Association of Retired Persons as *Amicus Curiae*; Brief for Lawyers' Committee for Civil Rights Under Law as *Amicus Curiae* 17–18.

Notwithstanding the apparent waiver of the issue below, I believe that the Court should reach the issue of the coverage of the FAA to employment disputes because resolution of the

question is so clearly antecedent to disposition of this case. On a number of occasions, this Court has considered issues waived by the parties below and in the petition for certiorari because the issues were so integral to decision of the case that they could be considered "fairly subsumed" by the actual questions presented. See, *e. g.*, *Teague* v. *Lane*, 489 U. S. 288, 300 (1989) ("The question of retroactivity with regard to petitioner's fair cross section claim has been raised only in an *amicus* brief. Nevertheless, that question is not foreign to the parties, who have addressed retroactivity with respect to petitioner's *Batson* claim. Moreover, our *sua sponte* consideration of retroactivity is far from novel" (citations omitted)); *Batson* v. *Kentucky*, 476 U. S. 79, 84–85, n. 4 (1986) (notwithstanding petitioner's seemingly deliberate failure to raise the equal protection issue, "[w]e agree with the State that resolution of petitioner's claim properly turns on application of equal protection principles and express no view on the merits of any of petitioner's Sixth Amendment arguments"); *Mapp* v. *Ohio*, 367 U. S. 643, 646, n. 3 (1961) ("Although appellant chose to urge what may have appeared to be the surer ground for favorable disposition and did not insist that *Wolf* be overruled, the *amicus curiae*, who was also permitted to participate in the oral argument, did urge the Court to overrule *Wolf*"). See also R. Stern, E. Gressman, & S. Shapiro, Supreme Court Practice § 6.26 (6th ed. 1986) (describing rule concerning need for presenting questions below and in petition for certiorari, and deviations from rule).

Only this Term, the Court has on at least two occasions decided cases on grounds not argued in any of the courts below or in the petitions for certiorari. In *Arcadia* v. *Ohio Power Co.*, 498 U. S. 73 (1990), we decided the case on an issue that not only was not raised below or in any of the papers in this Court, but that also was not raised at any point during oral argument before the Court. "In our view, however," the decided question was "antecedent to these [issues presented] and ultimately dispositive of the present dispute." *Id.*, at

77. Similarly, in *McCleskey* v. *Zant*, 499 U. S. 467 (1991), the Court issued a decision on a question which the parties had not argued below and evidently had not anticipated would be at issue in this Court, "since respondent did not even mention *Sykes* or cause-and-prejudice in its brief or at oral argument, much less request the Court to adopt this standard." *Id.*, at 522–523 (MARSHALL, J., dissenting).

In my opinion the considerations in favor of reaching an issue not presented below or in the petition for certiorari are more compelling in this case than in the cited cases. Here the issue of the applicability of the FAA to employment contracts was adequately briefed and raised by the *amici* in support of petitioner. More important, however, is that respondent and its *amici* had full opportunity to brief and argue the same issue in opposition. See Brief for Respondent 42–50; Brief for Securities Industry Association, Inc., as *Amicus Curiae* 18–20; Brief for Equal Employment Advisory Council et al. as *Amici Curiae* 14–16. Moreover, the Court amply raised the issue with the parties at oral argument, at which both sides were on notice and fully prepared to argue the merits of the question. Finally, as in *Arcadia*, the issue whether the FAA even covers employment disputes is clearly "antecedent . . . and ultimately dispositive" of the question whether courts and respondent may rely on the FAA to compel petitioner to submit his ADEA claims to arbitration.

II

The Court, declining to reach the issue for the reason that petitioner never raised it below, nevertheless concludes that "it would be inappropriate to address the scope of the § 1 exclusion because the arbitration clause being enforced here is not contained in a contract of employment. . . . Rather, the arbitration clause at issue is in Gilmer's securities registration application, which is a contract with the securities exchanges, not with Interstate." *Ante*, at 25, n. 2. In my

opinion the Court too narrowly construes the scope of the exclusion contained in § 1 of the FAA.

There is little dispute that the primary concern animating the FAA was the perceived need by the business community to overturn the common-law rule that denied specific enforcement of agreements to arbitrate in contracts between business entities. The Act was drafted by a committee of the American Bar Association (ABA), acting upon instructions from the ABA to consider and report upon "the further extension of the principle of commercial arbitration." Report of the Forty-third Annual Meeting of the ABA, 45 A. B. A. Rep. 75 (1920). At the Senate Judiciary Subcommittee hearings on the proposed bill, the chairman of the ABA committee responsible for drafting the bill assured the Senators that the bill "is not intended [to] be an act referring to labor disputes, at all. It is purely an act to give the merchants the right or the privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now that is all there is in this." Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 9 (1923). At the same hearing, Senator Walsh stated:

> "The trouble about the matter is that a great many of these contracts that are entered into are really not [voluntary] things at all. Take an insurance policy; there is a blank in it. You can take that or you can leave it. The agent has no power at all to decide it. Either you can make that contract or you can not make any contract. It is the same with a good many contracts of employment. A man says, 'These are our terms. All right, take it or leave it.' Well, there is nothing for the man to do except to sign it; and then he surrenders his right to have his case tried by the court, and has to have it tried before a tribunal in which he has no confidence at all." *Ibid.*

Given that the FAA specifically was intended to exclude arbitration agreements between employees and employers, I see no reason to limit this exclusion from coverage to arbitration clauses contained in agreements entitled "Contract of Employment." In this case, the parties conceded at oral argument that Gilmer had no "contract of employment" as such with respondent. Gilmer was, however, required as a condition of his employment to become a registered representative of several stock exchanges, including the New York Stock Exchange (NYSE). Just because his agreement to arbitrate any "dispute, claim or controversy" with his employer that arose out of the employment relationship was contained in his application for registration before the NYSE rather than in a specific contract of employment with his employer, I do not think that Gilmer can be compelled pursuant to the FAA to arbitrate his employment-related dispute. Rather, in my opinion the exclusion in § 1 should be interpreted to cover any agreements by the employee to arbitrate disputes with the employer arising out of the employment relationship, particularly where such agreements to arbitrate are conditions of employment.

My reading of the scope of the exclusion contained in § 1 is supported by early judicial interpretations of the FAA. As of 1956, three Courts of Appeals had held that the FAA's exclusion of "contracts of employment" referred not only to individual contracts of employment, but also to collective-bargaining agreements. See *Lincoln Mills of Ala.* v. *Textile Workers Union of America*, 230 F. 2d 81 (CA5 1956), rev'd, 353 U. S. 448 (1957); *United Electrical, Radio & Machine Workers of America* v. *Miller Metal Products, Inc.*, 215 F. 2d 221 (CA4 1954); *Amalgamated Assn. of Street, Electric R. and Motor Coach Employees of America* v. *Pennsylvania Greyhound Lines, Inc.*, 192 F. 2d 310 (CA3 1951). Indeed, the application of the FAA's exclusionary clause to arbitration provisions in collective-bargaining agreements was one of the issues raised in the petition for certiorari and

briefed at great length in *Lincoln Mills* and its companion cases, *Goodall-Sanford, Inc.* v. *Textile Workers*, 353 U. S. 550 (1957), and *General Electric Co.* v. *Electrical Workers*, 353 U. S. 547 (1957). Although the Court decided the enforceability of the arbitration provisions in the collective-bargaining agreements by reference to §301 of the Labor Management Relations Act, 1947, 29 U. S. C. §185, it did not reject the Courts of Appeals' holdings that the arbitration provisions would not otherwise be enforceable pursuant to the FAA since they were specifically excluded under §1. In dissent, Justice Frankfurter perceived a

> "rejection, though not explicit, of the availability of the Federal Arbitration Act to enforce arbitration clauses in collective-bargaining agreements in the silent treatment given that Act by the Court's opinion. If an Act that authorizes the federal courts to enforce arbitration provisions in contracts generally, but specifically denies authority to decree that remedy for 'contracts of employment,' were available, the Court would hardly spin such power out of the empty darkness of §301. I would make this rejection explicit, recognizing that when Congress passed legislation to enable arbitration agreements to be enforced by the federal courts, it saw fit to exclude this remedy with respect to labor contracts." *Textile Workers* v. *Lincoln Mills*, 353 U. S., at 466.

### III

Not only would I find that the FAA does not apply to employment-related disputes between employers and employees in general, but also I would hold that compulsory arbitration conflicts with the congressional purpose animating the ADEA, in particular. As this Court previously has noted, authorizing the courts to issue broad injunctive relief is the cornerstone to eliminating discrimination in society. *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 415 (1975). The ADEA, like Title VII of the Civil Rights Act of 1964, au-

thorizes courts to award broad, class-based injunctive relief to achieve the purposes of the Act. 29 U. S. C. § 626(b). Because commercial arbitration is typically limited to a specific dispute between the particular parties and because the available remedies in arbitral forums generally do not provide for class-wide injunctive relief, see Shell, ERISA and Other Federal Employment Statutes: When is Commercial Arbitration an "Adequate Substitute" for the Courts?, 68 Texas L. Rev. 509, 568 (1990), I would conclude that an essential purpose of the ADEA is frustrated by compulsory arbitration of employment discrimination claims. Moreover, as Chief Justice Burger explained:

> "Plainly, it would not comport with the congressional objectives behind a statute seeking to enforce civil rights protected by Title VII to allow the very forces that had practiced discrimination to contract away the right to enforce civil rights in the courts. For federal courts to defer to arbitral decisions reached by the same combination of forces that had long perpetuated invidious discrimination would have made the foxes guardians of the chickens." *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 750 (1981) (dissenting opinion).

In my opinion the same concerns expressed by Chief Justice Burger with regard to compulsory arbitration of Title VII claims may be said of claims arising under the ADEA. The Court's holding today clearly eviscerates the important role played by an independent judiciary in eradicating employment discrimination.

## IV

When the FAA was passed in 1925, I doubt that any legislator who voted for it expected it to apply to statutory claims, to form contracts between parties of unequal bargaining power, or to the arbitration of disputes arising out of the employment relationship. In recent years, however, the Court

"has effectively rewritten the statute,"[1] and abandoned its earlier view that statutory claims were not appropriate subjects for arbitration. See *Mitsubishi Motors* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 646–651 (1985) (STEVENS, J., dissenting). Although I remain persuaded that it erred in doing so,[2] the Court has also put to one side any concern about the inequality of bargaining power between an entire industry, on the one hand, and an individual customer or employee, on the other. See *ante*, at 32–33. Until today, however, the Court has not read § 2 of the FAA as broadly encompassing disputes arising out of the employment relationship. I believe this additional extension of the FAA is erroneous. Accordingly, I respectfully dissent.

---

[1] See *Perry* v. *Thomas*, 482 U. S. 483, 493 (1987) (STEVENS, J., dissenting); *id.*, at 494 (O'CONNOR, J., dissenting); *Southland Corp.* v. *Keating*, 465 U. S. 1, 36 (1984) (O'CONNOR, J., dissenting) ("[T]oday's exercise in judicial revisionism goes too far").

[2] See *Shearson/American Express Inc.* v. *McMahon*, 482 U. S. 220, 252–253 (1987) (BLACKMUN, J., concurring in part and dissenting in part); *id.*, at 268 (STEVENS, J., concurring in part and dissenting in part); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 486 (1989) (STEVENS, J., dissenting).