**Rossi GAMBARDELLA**

v.

**PENTEC, INC., et al.**

**No. 3:01CV1827(JBA).**

United States District Court, D. Connecticut.

July 11, 2002.

---

John Ivar Bolton, Bridgeport, CT, for Plaintiff.

U.S. Court of Appeals, Office of the Clerk, New York City, Notice only.

Alan I. Scheer, O'Connell, Flaherty & Attmore, Michael Alan Kurs, Pullman & Comley, Hartford, CT, Hartford, CT, for Defendants.

## RULING ON PENDING MOTIONS

### [Docs. # 9, 18]

ARTERTON, District Judge.

Plaintiff Rossi Gambardella, a former employee of defendant Pentec, Inc. ("Pentec"), filed suit alleging that she was dis-

charged because of her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Connecticut state law, as well as state law claims of fraudulent representation, negligent and intentional infliction of emotional distress, bad faith, retaliation for pursuit of fundamental rights and wrongful discharge. Plaintiff also claims that defendants Michael Callahan, Michael Verrengia and Sheila Evon, employees of Pentec, aided, abetted and incited Pentec's allegedly unlawful actions.

Citing an arbitration agreement signed by plaintiff after commencement of her employment with Pentec, defendants have moved to dismiss or alternatively to stay this proceeding pending arbitration, and for an order compelling arbitration of plaintiff's claims, under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"). Defendants have also requested that the Court appoint an arbitrator pursuant to 9 U.S.C. § 5 because no method of appointment of an arbitrator is specified in the arbitration agreement.

## I. Factual background [1]

Gambardella began work as a temporary-to-hire associate pension analyst at Pentec on March 30, 1999. She became a permanent employee on June 28, 1999. Plaintiff alleges that "[t]he terms and conditions of plaintiff's employment were that she would continue to be employed and promoted so long as she performed satisfactorily the duties of her position." Amended Compl. ¶ 20.

On July 28, plaintiff alleges that she attended an office meeting, during which she was given a copy of Pentec's arbitration agreement and an acknowledgment form indicating that plaintiff had received an employee manual and that she was an "at will" employee. Plaintiff claims that she does not recall receiving an employment manual on that date. Defendant Verrengia distributed the materials at the meeting, and allegedly represented that "any employee who wished to remain gainfully employed with Pentec, Inc. was required to execute the arbitration agreement. Furthermore, no employee of Pentec, Inc. was exempt from this requirement." *Id.* at ¶ 24. Plaintiff claims Verrengia also represented that "arbitration was the most cost effective manner within [sic] which to resolve employment related claims yet failed to articulate to the plaintiff and others at the meeting the nature of the arbitration process and its inherent costs—if pursued." *Id.* at ¶ 25. Defendant Callahan, plaintiff's supervisor, also attended this meeting and "validated Verrengia's representations." *Id.* at ¶ 26. Plaintiff claims that she signed the arbitration agreement at the meeting because she was informed that it had to be signed immediately and without delay, and she feared losing her employment. *Id.* at ¶ 27. Plaintiff also claims at the time she executed the agreement, she believed that all of Pentec's employees were required to sign the agreement, and plaintiff "therefore kept her protest to the agreement silent." *Id.* at ¶ 28.

Plaintiff's employment at Pentec continued without event until February 22, 2000, when she was in an automobile accident. Both plaintiff and her husband advised defendant Evon, Pentec's Office Manager/Benefits Administrator, that plaintiff would be out of work. Plaintiff's husband also told Evon that because plaintiff might be pregnant, multiple tests were required. According to plaintiff, defendant Evon "became very inquisitive and had begun to ask Mr. Gambardella intrusive and personal

---

**1.** The following allegations are taken from plaintiff's amended complaint, except where noted.

medical/health related" questions about plaintiff. *Id.* at ¶ 32.

Plaintiff did not return to work until February 28, 2000. On Sunday February 27, defendant Callahan called plaintiff at home and assured her that her job was secure and that he understood how important it was for her to heal from her injuries. During this conversation, plaintiff informed Callahan that she wanted to return to work to complete a major project that was due in March.

On February 28, plaintiff returned to work. "At that time she was questioned rather vigorously by senior management as to her medical condition. While Rossi appreciated what at first appeared to be genuine concern from her employers, the intensity in [sic] which she was questioned by defendants Verrengia, Callahan and Evon made her feel uncomfortable." *Id.* at ¶ 35. Plaintiff was able to work for only approximately two hours that day due to the pain. Before plaintiff left, however, she was directed by Callahan to meet with Evon about applying for disability benefits. At that time, plaintiff claims Callahan again assured her that her position was secure and that she was a valued employee.

During the meeting with Evon, Evon allegedly presented plaintiff with a partly completed short term disability application. Plaintiff decided against applying for benefits through Pentec because she already had disability coverage through her automobile insurer, which she believed was superior, and because she wished to avoid the required medical disclosures of Pentec's policy, which she considered "extremely onerous and intrusive." *Id.* at ¶ 38(a). Plaintiff also claims that she felt "most uncomfortable receiving a 1099 form

from her employer that was not representative of her compensation for Tax Year 1999. In fact, Rossi voiced concern over the legality of receiving such a 'benefit' since she was being encouraged by the defendant Evon to purposely falsify the nature of her 1999 taxable income." *Id.* at ¶ 38(d).

On March 2, 2000, while still out on medical leave, plaintiff learned that she was not pregnant. She reported the information to Evon, and informed Evon "that she was still experiencing tremendous discomfort from her injuries. Evon accepted said representations and after learning that plaintiff was not pregnant approached plaintiff's return to work in a very informal, casual and non-rigid manner that relaxed the thrust of the employee manual." *Id.* at 41. Shortly thereafter, Rossi received a get well card, signed by her coworkers; Verrengia and Evon "wished plaintiff a speedy recovery and quick return to work." *Id.* at ¶ 42.

A month later, plaintiff again reported to Evon to inform Pentec of her progress and treatments. During this conversation, plaintiff also told Evon that she was pregnant. Evon then requested that plaintiff "provide her with doctor's reports and disability certificates to justify her continued absence from work along with a written statement form [sic] Rossi explaining why she elected to not accept Pentec's short term disability benefit." *Id.* at ¶ 43. Plaintiff found these requests unusual, because she had provided Evon with all the desired information about her injuries, and Evon was aware why plaintiff wanted to pursue benefits through her insurer rather than Pentec. On April 7, 2000, Evon forwarded a letter to plaintiff memorializing the request for documents.[2] Plaintiff for-

---

**2.** Plaintiff also learned that Pentec had contacted her health insurer seeking her medical information just before she received Evon's April 7 written request, and an individual

from Aetna Insurance Company, plaintiff's health insurer, represented to plaintiff's husband that the information was shared with Pentec, despite the fact that plaintiff at no

warded the requested documentation to Evon on April 10, 2000. When plaintiff contacted Evon on April 10 to confirm receipt, she was erroneously informed that Evon was on vacation that week, but received confirmation that she had complied with Pentec's request.

Defendant Callahan contacted plaintiff on April 11, inquiring when plaintiff would return to work. Callahan allegedly "volunteered to the plaintiff that another employee at Pentec was pregnant with an expected due date of August 2000 and that he could not afford to lose the services of two (2) employees in pregnancy in such time proximity to one another. Despite this representation, Callahan added that Rossi's job was secure and he merely wanted to estimate plaintiff's return to work." *Id.* at ¶ 49. On April 15, plaintiff consulted with her physician and obtained a return to work authorization with an estimated date of May 1, 2000. This information was immediately provided to Pentec. Plaintiff claims that "[a]t no time prior to April 7, 2000 or within the contents of said correspondence did Evon warn, discipline or otherwise alert Rossi that her employment with Pentec was in peril or that Rossi had any specific reporting obligations with regard to her prolonged absence." *Id.* at ¶ 46.

Plaintiff claims that "defendants' tone, tenor, approach and treatment of plaintiff reversed after learning in early April that Rossi had become pregnant." *Id.* at ¶ 52. On April 18, despite complying with all Pentec's requests, plaintiff was terminated without warning, based on plaintiff's alleged unauthorized leave of absence, failure to accept and/or apply for disability benefits through Pentec, failure to provide an estimated return to work date, failure to communicate with management and provide documentation during her absence, and failure to return to work within forty-five days of the injuries sustained in the February 22 accident.

## II. Discussion

Defendants argue that the Court should compel arbitration of the claims against them consistent with the terms of the agreement signed by plaintiff. According to defendant, plaintiff's allegations of misrepresentations are insufficient to prevent arbitration, and plaintiff has not lost any substantive rights through the agreement to arbitrate. Plaintiff maintains that because she was fraudulently induced to sign the arbitration agreement, it is unenforceable. Alternatively, she argues that because the agreement provides for splitting of the cost of arbitration, it is unenforceable because she would be deprived of substantive federal rights if the Court were to compel arbitration. The Court considers each of these arguments in turn.

### A. *Enforcement of arbitration by non-signatories*

■ The first issue is whether the individual defendants may compel plaintiff to arbitrate the claims against them where they were admittedly not signatories to the arbitration agreement. Under Second Circuit law, claims against non-signatories to an arbitration agreement may also be subject to mandatory arbitration, where " 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.' " *Choctaw Generation Ltd. Partnership v. American Home Assurance Co.,* 271 F.3d 403, 404 (2d Cir.2001) (*quoting Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995)). Thus, in *Campaniello Imports Inc. v. Saporiti Italia S.p.A.,* 117 F.3d 655, 669 (2d Cir.1997), the court held that claims against an individual employee that arose

time authorized Aetna to disseminate this information to her employer.

out of the relationship between plaintiff and that individual's employer, which was the subject of a mandatory arbitration agreement, were also subject to mandatory arbitration. Here, the claims against Verrengia, Evon and Callahan are all directly related to their employment with Pentec and to Gambardella's claims against Pentec, which are indisputably within the scope of the arbitration agreement at issue here.

Plaintiff argues that the Supreme Court's decision in *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002), impliedly overturned these decisions. In that case, the Supreme Court held that the EEOC could not be barred from seeking victim-specific relief under Title VII, even where the individual employee had signed a mandatory arbitration agreement. The Court noted that "nothing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement. The FAA does not mention enforcement by public agencies; it ensures the enforceability of private agreements to arbitrate, but otherwise does not purport to place any restriction on a nonparty's choice of a judicial forum." *Id.* at 761. The Court further observed that "[i]t goes without saying that a contract cannot bind a nonparty." *Id.* at 764. Thus, the Supreme Court concluded that the EEOC—a non-signatory—could not be bound by an employee's arbitration agreement.

However, the issue here is not whether non-signatories to the agreement can be compelled to arbitrate; rather, it is whether these non-signatories may compel plaintiff, admittedly a party to the contract, to arbitrate. *See Choctaw*, 271 F.3d at 406 (noting this distinction). *EEOC v. Waffle House* does not alter this analysis, and the claims against the individual defendants are subject to the arbitration agreement.

## B. *Fraud or misrepresentations*

"The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., establishes a liberal policy in favor of arbitration, as a means to reduce the costliness and delays of litigation." *Campaniello Imports Inc. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 665 (2d Cir.1997) (internal citations and quotations omitted). However, the FAA makes " 'arbitration agreements as enforceable as other contracts, but not more so.' " *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 831 (2d Cir.1988) (*quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)).

Under the FAA, a federal court must order arbitration to proceed in accordance with the terms of the agreement once the court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4. The Supreme Court has elaborated that while a claim of "fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate" may be adjudicated by the court, "the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Moreover, as the Second Circuit has noted, "there must be some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular in order to protect the obvious distinction drawn in *Prima Paint* between the arbitrability of fraud relating to a contract generally and fraud in the inducement of the arbitration clause in particular." *Campaniello*, 117 F.3d at 667.

In resolving whether a party was fraudulently induced to enter into an arbitration agreement, the Court applies state contract law principles. *First Options of Chicago v. Kaplan*, 514 U.S. 938, 943–44, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Under Connecticut law, "[t]he essential elements of an action in fraud ... are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller v. Appleby*, 183 Conn. 51, 54–55, 438 A.2d 811 (1981). Moreover, a claim of fraud must be proven by clear and satisfactory evidence. *Id.* at 55, 438 A.2d 811; *Regis v. Connecticut Real Estate Investors Balanced Fund, Inc.*, 28 Conn.App. 760, 768, 613 A.2d 321 (1992).

Defendants argue that notwithstanding plaintiff's claim that their allegedly fraudulent misrepresentations that all employees were required to sign the arbitration agreement induced her to sign the agreement, it is enforceable because plaintiff's "fraud claim only runs to the acknowledgment and agreement to arbitrate that she signed after accepting her employment subject to the obligation to arbitrate in the Associate Manual. She does not maintain that she was fraudulently induced into accepting and continuing employment subject to the duty to arbitrate her complaints against Pentec." Def. Br. at 12. Thus, defendants argue that because plaintiff's employment with Pentec was *always* subject to mandatory arbitration under the manual, even before the arbitration agreement was signed, she cannot have detrimentally relied on any misrepresentation by Verrengia.

Plaintiff's fraud claim is not based on any contention that Verrengia or any of the defendants misrepresented the terms of the arbitration agreement or that she was somehow unaware that she was signing an arbitration agreement. Instead, her argument is that she detrimentally relied on Verrengia's misrepresentations that she had no choice but to sign the agreement—if she wanted to keep her job—when, in fact, other employees were permitted to keep their jobs without signing the agreement.[3] In her affidavit, Gambardella states as follows:

> At [a July 28, 1999] meeting Michael Verrengia stated that all employees of Pentec, Inc. were required to execute this document if they wished to remain employees of the company.
>
> Michael Callahan also made this representation and indicated that there was no choice but to sign the arbitration agreement.
>
> Not wanting to lose my job I executed the document on the same date in [sic] which it was presented to me.
>
> I later learned through the defendants' response to the CHRO that not all employees of Pentec, Inc. were bound to arbitration as represented.
>
> *     *     *     *     *     *
>
> The misrepresentations made by Michael Verrengia pertained to inducing me to sign the arbitration agreement.

Gambardella Aff. at ¶¶ 5–9.

Assuming that this conduct could support a claim of fraud in the inducement, however, plaintiff's affidavit does not address the fact that the Associate Manual, which contains Pentec's arbitration policy, specifically states:

**3.** The affidavit of Sheila Evon submitted by defendants does not deny that some employees were not required to agree to arbitration, nor does it make any effort to distinguish plaintiff from these employees.

By simply accepting or continuing employment with Pentec, Inc., you *automatically* agree that arbitration is the exclusive remedy for all disputes arising out of or related to your employment with Pentec, Inc. and you agree to waive all rights to a civil court action regarding your employment and the termination of your employment with Pentec, Inc.; only the arbitrator, and not a judge nor a jury, will decide the dispute.

Plaintiff has offered no evidence that any of the employees who did not sign the acknowledgment form were not bound to mandatory arbitration by this statement in the Associate Manual, nor does she argue that such language is not enforceable. *Cf. Thomson–CSF S.A. v. American Arbitration Assoc.*, 64 F.3d 773, 776–77 (2d Cir. 1995) (holding that parties may be bound to unsigned, written arbitration agreements as long as the "ordinary principles of contract and agency" are satisfied). Pentec's CHRO response, the only evidence cited by plaintiff in support of her contention that some employees were not required to sign the acknowledgment form, simply states:

Respondent specifically denies that it told Complainant that if she did not sign the documents, she could not be employed by [Respondent], and Respondent further states affirmatively that it has employees who have not signed these documents and who remain employed by Respondent.

Pl.Ex. A, at ¶ 6. Thus, even if misrepresentations about the necessity of signing the acknowledgment form were made, plaintiff has not submitted anything from which the Court could conclude that any Pentec employee is not in fact subject to mandatory arbitration, and the alleged misrepresentations by Verrengia have therefore not been shown to be material.[4]

## C. *Accessibility of arbitration forum*

■ Plaintiff recognizes that the Supreme Court held that arbitration agreements with respect to employment contracts are generally enforceable in *Circuit City Stores Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), and she does not argue that mandatory arbitration clauses do not apply to Title VII claims. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (ADEA claims may be subject to compulsory arbitration); *Desiderio v. NASD*, 191 F.3d 198, 207 (2d Cir.1999) (Title VII claims); *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1487 (10th Cir.1994) (pregnancy discrimination claims); *Bender v. A.G. Edwards*, 971 F.2d 698, 700 (11th Cir.1992) (sexual harassment claims); *Ball v. SFX Broadcasting, Inc.*, 165 F.Supp.2d 230, 238 (N.D.N.Y.2001) (Title VII claims); *Bolduc v. Bridgestone/ Firestone, Inc.*, 116 F.Supp.2d 322, 325 (D.Conn.2000) (Title VII claims). However, plaintiff argues that the arbitration agreement cannot be enforced because the agreement requires her to bear half the cost of arbitration and thereby deprives her of an adequate forum for her Title VII claims.[5]

In *Gilmer*, the Supreme Court found that enforcing compulsory arbitration of plaintiff's ADEA claims was not inconsistent with the statutory framework and

---

4. The Court also notes that plaintiff's affidavit states carefully that "[t]he misrepresentations made by Michael Verrengia *pertained* to inducing me to sign the arbitration agreement," at ¶ 9 (emphasis added), but does not aver that she in fact relied on the misrepresentations in signing the agreement.

5. Pentec's arbitration policy provides:

You and Pentec, Inc. shall each bear respective costs for legal representation at any such arbitration. The cost of the arbitrator and court reporter, if any, shall be shared equally by the parties.

Def. Ex. 2, Associate Manual, at 4.

purposes of the ADEA, noting that " '[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function.' " 500 U.S. at 28, 111 S.Ct. 1647 (*quoting Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 637, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). In concluding that ADEA claims were arbitrable, the Court also emphasized that " '[b]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *Id.* at 26, 111 S.Ct. 1647 (*quoting Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346).

The Supreme Court returned to the issue of mandatory arbitration of federal statutory claims in *Green Tree Financial Corp. v. Randolph,* 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). In that case, the Court ruled that the mere fact that the arbitration agreement said nothing about costs and thus did not protect the plaintiff from the potentially substantial costs of arbitration was not enough to render the agreement unenforceable. *Id.* at 89–92, 121 S.Ct. 513. Importantly, however, the Court noted that:

> it may well be that the existence of large arbitration costs could preclude a litigant such as Randolph from effectively vindicating her federal statutory rights in the arbitral forum. But the record does not show that Randolph will bear such costs if she goes to arbitration. Indeed, it hardly contains any information on the matter.... The record reveals only the arbitration agreement's silence on the subject, and that fact alone is plainly insufficient to render it unenforceable. The "risk" that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.

*Id.* at 90–91, 121 S.Ct. 513. The Court concluded that in light of the liberal federal policy favoring arbitration, "where ... a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 92, 121 S.Ct. 513. Thus, the Supreme Court has rejected the argument advanced by plaintiff that the mere uncertainty of expense renders an arbitration agreement unenforceable.

Instead, under *Green Tree,* the appropriate inquiry is whether plaintiff has shown that the costs of arbitration are likely to be prohibitively expensive. *See Bradford v. Rockwell Semiconductor Sys., Inc.,* 238 F.3d 549, 555 (4th Cir.2001) (rejecting plaintiff's argument that fee splitting renders an arbitration agreement *per se* unenforceable, and concluding that the fact that the plaintiff initiated the arbitration demonstrated that he "was in no way deterred from attempting to vindicate his rights by means of a full and fair arbitration proceeding" and noting that there was no demonstration of financial hardship); *Blair v. Scott Specialty Gases,* 283 F.3d 595 (3d Cir.2002) ("The *Green Tree* decision thus informs us that claimants have the burden to come forward with some evidence to show the projected fees that would apply to their specific arbitrations."); *see also Shankle v. B–G Maint. Mgmt. of Colo., Inc.,* 163 F.3d 1230, 1234 (10th Cir.1999) (agreement requiring employee to bear half the costs of arbitration "placed [the employee] between the proverbial rock and a hard place—it prohibited use of the judicial forum, where a litigant is not required to pay for a judge's services, and the prohibitive cost substantially limited use of the arbitral forum").

Here, unlike *Green Tree,* the agreement is not silent as to costs; it specifies that plaintiff will bear half. Thus, there is a certainty that plaintiff will incur some

costs, although plaintiff has submitted nothing from which the Court could conclude that the costs are likely to personally burden her financial ability to pursue her statutory claims. However, related to plaintiff's claim of undue financial burden is an alternative ground under which the Court finds this agreement unenforceable: the arbitration agreement provides that each party will pay its own legal fees in direct contravention to Title VII's statutory right to attorneys' fees for prevailing plaintiffs.

The Supreme Court has noted that "a Title VII plaintiff ... is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 523, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (quotations and citations omitted). Relying on Congress' intent to cast civil rights plaintiffs in the role of private attorneys general, and on the fact that attorneys fee awards to prevailing plaintiffs are necessarily awarded against violators of federal law, the Supreme Court has held that a prevailing civil rights plaintiff should ordinarily recover attorney fees unless special circumstances would render such an award unjust. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 416–18, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Lyte v. Sara Lee Corp.*, 950 F.2d 101, 103 (2d Cir.1991) ("While the language of the Title VII fee provision refers to the award as discretionary, a prevailing plaintiff is in fact entitled to fees 'unless special circumstances would render such an award unjust' in light of the congressional goals underlying enforcement of fee awards in civil rights litigation.") (*quoting Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

In *Graham Oil Co. v. ARCO Products Co.*, 43 F.3d 1244 (9th Cir.1994), the Ninth Circuit struck down an arbitration clause because it denied the plaintiff the benefit of certain rights to which the plaintiff was entitled under the federal Petroleum Marketing Practices Act ("PMPA"), such as exemplary damages, attorney's fees, and a one-year statute of limitations. *Id.* at 1247–48. The court found that the attorneys' fee provision was important to the effectuation of the PMPA's policies, and struck the entire arbitration clause from the agreement. *Id.* at 1248–49.

Citing the importance of the attorneys' fee provision to the enforcement of Title VII's statutory scheme, numerous district courts have ruled that arbitration agreements that provide that each party shall bear their own attorneys' fees are void as against public policy. *See, e.g., Hooters of Am., Inc. v. Phillips*, 39 F.Supp.2d 582, 616 (D.S.C.1998) (arbitration agreement that denies Title VII plaintiff the right to recover attorneys fees is void as a matter of public policy); *DeGaetano v. Smith, Barney, Inc.*, 983 F.Supp. 459, 469 (S.D.N.Y.1997) (awarding attorneys fees following the plaintiff's victory in arbitration of a Title VII claim notwithstanding the arbitration agreement's provision that each party shall bear their own costs because "an attorney's fee award [is] one of the principal remedies afforded by Title VII, and one of the chief statutory mechanisms designed to effectuate Congress's policy goals of enforcement and deterrence"); *Gourley v. Yellow Transp., LLC*, 178 F.Supp.2d 1196, 1204 (D.Colo.2001) (arbitration agreement prohibiting filing of post-trial briefs unenforceable because it would interfere with ability to obtain attorneys fees under Title VII).[6]

---

**6.** The Seventh Circuit also recently ruled that such a provision rendered an arbitration agreement unenforceable because the right to attorneys' fees is integral to the purposes of Title VII, although rehearing has been granted and the ruling has been vacated pending rehearing. *See McCaskill v. SCI Management*

Plaintiff seeks, inter alia, backpay and frontpay as a remedy for the allegedly unlawful termination. She also seeks attorneys' fees. But for the arbitration agreement, she would presumptively be entitled to recover both her attorneys' fees and costs under Title VII if she prevailed. By denying Gambardella access to a remedy Congress made available to ensure that violations of the Title VII are effectively remedied and deterred, the arbitration agreement drafted by Pentec impermissibly erodes the ability of arbitration to serve those purposes as effectively as litigation.

### III. Conclusion

Because arbitration under the terms of the agreement between plaintiff and Pentec cannot be said to provide a satisfactory forum for the vindication of Gambardella's federal rights under Title VII, defendants' motions to dismiss and to compel arbitration [Docs. # 9, 18] are DENIED.

IT IS SO ORDERED.

*Corp.,* 285 F.3d 623, 626–27 (7th Cir.2002), *vacated,* 294 F.3d 879 (7th Cir.2002).