Terry L. BUCKLEY, Plaintiff,

v.

NABORS DRILLING USA, INC., Defendant.

No. G–01–623.

United States District Court, S.D. Texas, Galveston Division.

March 15, 2002.

Anthony H. Buzbee, Attorney at Law, Friendswood, TX, for plaintiff.

Thomas J. Smith, Galloway Johnson et al., Houston, TX, Andrew Z. Schreck, Fossi & Crain, Houston, TX, for defendants.

*ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY OR DISMISS THIS ACTION PENDING SUCH ARBITRATION*

KENT, District Judge.

Plaintiff Terry Buckley ("Buckley") is a seaman who seeks to recover damages pursuant the Jones Act, 46 U.S.C.App. § 688, *et seq.*, and the General Maritime Law of the United States, for injuries sustained while working aboard an offshore drilling rig. Now before the Court is Defendant Nabors Offshore Corporation's ("Nabors") Motion to Compel Arbitration and to Stay or Dismiss this Action Pending Such Arbitration. For the reasons stated below, Defendant's Motion is hereby **DENIED.**

## I.

The following facts are relevant to the Court's evaluation of Defendant's Motion. For some period of time prior to the filing of this lawsuit, Plaintiff Buckley was an at-will employee of Defendant Nabors.[1] On April 15, 2001, Nabors adopted the "Nabors Dispute Resolution Program" ("DRP"), which effectively required all Nabors employees to resolve disputes against Nabors through binding arbitration proceedings. Among the various types of disputes subject to the DRP's binding arbitration clause was "any personal injury allegedly incurred in or about a Company workplace or in the course and scope of an Employee's employment." (DRP ¶ 2.) Between April 16, 2001 and May 4, 2001, Nabors notified employees of the newly enacted DRP by mailing copies of the DRP, as well as explanatory letters, with employees' paychecks or direct deposit notices. (Mainord Aff. ¶ 6.) Nabors specifically claims that Buckley, as a listed Nabors employee, received the DRP materials with one or two of his direct deposit notices. (Mainord Aff. ¶¶ 7, 8.)

On June 6, 2001, Buckley alleges that he was working as an employee of Nabors aboard the RANGER V when he sustained severe injuries to his lower back, right leg, shoulder, and other parts of his body. On October 11, 2001, Buckley filed the instant lawsuit against Nabors Drilling USA, Inc. On January 15, 2002, Buckley filed his First Amended Complaint adding Nabors Offshore Corporation as a Defendant, and specifically averring that his injuries were caused in whole or in part by Defendants' negligent conduct and/or the unseaworthiness of the RANGER V. Thereafter, Na-

---

1. There appears to exist some dispute as to the precise corporate entity that employed Buckley. In its Motion, Defendant contends in a footnote that Buckley was only employed by Defendant Nabors Offshore Corporation, *not* Defendant Nabors Drilling USA. Plaintiff implies in his First Amended Complaint that he was employed by both Defendant corporations. Because Defendant Nabors Drilling USA has not moved for dismissal on the basis of this alleged defect, the Court will not resolve this issue at this time.

bors filed a Motion to Compel Arbitration and to Stay or Dismiss this Action Pending Such Arbitration, to which the Court now turns.

## II.

At the outset, the Court observes that there is a strong federal policy favoring the arbitration process. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991) (noting that the Federal Arbitration Act manifests a liberal federal policy favoring arbitration agreements); *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 476, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989); *Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409, 412–13 (5th Cir.1984). When confronted with the question of arbitrability, a district court must determine, as a threshold matter, whether the grievance before it is subject to arbitration. *See Folse v. Richard Wolf Med. Instruments Corp.*, 56 F.3d 603, 605 (5th Cir.1995); *Oil, Chem. & Atomic Workers Int'l Union Local 4–227 v. Phillips 66 Co.*, 976 F.2d 277, 278 (5th Cir. 1992). This determination mandates two specific inquiries. The Court first asks whether there is a valid agreement to arbitrate; if so, the Court then asks whether the dispute in question falls within the scope of the agreement. *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir.1996). Here, the Court need only make the first of these two determinations, that is, whether a valid agreement to arbitrate exists.

## III.

Section 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Both Parties agree that the instant arbitration clause, if deemed to be otherwise valid, would be governed by the FAA since it involves "a contract evidencing a transaction involving commerce." *Id.* However, the principal issue of contention in this case is whether Buckley's status as a seaman excludes him from coverage under the FAA, and secondarily, whether Buckley entered into an agreement to arbitrate with Nabors at all. In an artful and well-prepared Motion, Defendant maintains that a valid and enforceable arbitration agreement exists between itself and Plaintiff under the FAA, since Plaintiff is not the type of seaman contemplated under the FAA's exemption clause, and Plaintiff's continued employment with Nabors following Plaintiff's receipt of the DRP mailing constitutes acceptance of the binding arbitration provision. Although the Court commends Defendant for its vigorous and thoughtful briefing, it cannot concur with Defendant's grossly erroneous conclusions, which run contrary to the holdings of the United States Supreme Court and other applicable law.

Section 1 of the FAA excludes from the Act's coverage any "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Initially, the Court observes that it is quite apparent from the plain language of § 1 that seamen are explicitly beyond the FAA's reach. Interestingly, however, Defendant never challenges Plaintiff's status as a seaman. Rather, in a strained effort to overcome the formidable textual obsta-

cle posed by § 1, Defendant sets out in its Motion to construe § 1 in a manner that would limit its application to those seamen who are actually engaged in the movement of goods in interstate commerce. Essentially, Defendant tries to distinguish between regular seamen, and those seaman who are directly involved in the movement of goods. Defendant further claims that Plaintiff does not fall within this latter category of seamen, thereby depriving him of the protections of § 1. To buttress this interpretation, Defendant relies upon the United States Supreme Court's recent opinion in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001), as well as related predecessor cases emanating from the circuit courts. Defendant also attempts to extrapolate support from the Fifth Circuit's ruling in *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518 (5th Cir.1989). To whatever extent these cases are impressive upon the instant inquiry, the Court finds that such jurisprudence only operates to negate Defendant's interpretation of § 1.

In *Circuit City*, the Supreme Court examined the FAA's exemption clause in the context of a Ninth Circuit ruling that interpreted § 1 to apply to *all* contracts of employment, such that *no* contracts of employment would be governable under the FAA. 532 U.S. at 110, 121 S.Ct. at 1306. In debunking the Ninth Circuit's rather expansive reading of § 1, the Supreme Court dissected the text and legislative history of the FAA, as well as the contrasting views of other appellate courts, and ultimately determined that the § 1 exemption was intended to apply to the employment contracts of transportation workers only. *Id.*, 532 U.S. at 111–21, 121 S.Ct. at 1307–12. Based on *Circuit City*, Defendant contends that the FAA's exemption provision applies only to seamen who are *actually* engaged in the movement of goods in interstate commerce, thereby leaving Plaintiff squarely outside the category of exempt seamen. Defendant specifically recites selected portions of the Supreme Court's textual analysis of § 1, which commences by classifying the words "any other class of workers engaged in . . . commerce" as a residual phrase that follows, in the same sentence, specific reference to "seamen" and "railroad employees." *Id.*, 532 U.S. at 114, 121 S.Ct. at 1308. The *Circuit City* court then enunciates the general maxim of *ejusdem generis* that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.*, 532 U.S. at 114–15, 121 S.Ct. at 1308–09 (citations and quotations omitted). In applying this maxim, the Supreme Court concludes that "[u]nder this rule of construction the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Id.*, 532 U.S. at 115, 121 S.Ct. at 1309. From this particular patchwork of language from *Circuit City*, Defendant derives the theory that § 1 extends only to seamen directly involved in the transportation of goods.

The Court wholly rejects Defendant's misguided construction and application of *Circuit City* and other related appellate court cases. In arriving at the conclusion that § 1 refers only to seamen actually involved in the moving of goods, Defendant minces words and concepts, quotes language entirely out of context, and misinterprets the fundamental reasoning underpinning the *Circuit City* decision. A thorough and comprehensive reading of *Circuit City* facilely reveals that the text and legislative history of § 1 support only one plausible interpretation of the statute's reference to seamen and railroad work-

ers—namely, that § 1 exempts from the FAA's coverage *all* seamen, as well as *all* railroad employees, by virtue of the fact that *all* seamen and *all* railroad employees are directly involved in the transport of goods in interstate commerce.

To fully appreciate this interpretation of § 1, the Supreme Court's opinion in *Circuit City* must be viewed in a holistic context. First, it should be noted that the Supreme Court was charged only with evaluating the narrow question of whether § 1 barred *all* employment contracts from the scope of the FAA's reach. Accordingly, the court's analysis was targeted solely at answering this question, and any resulting implication upon the status of seamen and railroad employees under § 1 is arguably dicta. Notwithstanding this fact, both the holding and dicta of *Circuit City* contravene Defendant's interpretation of § 1. Primarily, Defendant misconstrues the Supreme Court's textual analysis of the statute. In finding that the residual clause in § 1 gives effect to the terms "seamen" and "railroad employees," the Supreme Court was not implying that § 1 refers only to seamen and railroad employees who are "engaged in foreign and interstate commerce." Instead, the *Circuit City* court explicitly announced the diametrically opposite view: "Construing the residual phrase to exclude all employment contracts fails to give independent effect to the statute's enumeration of the specific categories of workers which precedes it; *there would be no need for Congress to use the phrases 'seamen' and 'railroad employees' if those same classes of workers were subsumed within the meaning of the 'engaged in . . . commerce' residual clause.*" *Id.,* 532 U.S. at 114, 121 S.Ct. at 1308 (emphasis added). Consistently referring to "seamen" and "railroad employees" as the *specific* categories of workers enumerated under § 1, the Supreme Court in *Circuit City* was clearly differentiating between two categories of workers: the

specific groups of workers, "seamen" and "railroad employees," who were implicitly engaged in commerce by the very nature of their jobs, and the residual "other class of workers," who could only qualify for § 1 exemption if they were similarly engaged in foreign or interstate commerce. This interpretation is further elucidated by the Supreme Court's discussion of the legislative history of § 1. The Supreme Court surmises that Congress probably singled out seamen and railroad employees for exemption from the FAA because it had already enacted federal legislation otherwise providing for the arbitration of disputes between seamen and their employers, and similarly, grievance procedures already existed for railroad employees under federal law. *Id.,* 532 U.S. at 120–21, 121 S.Ct. at 1312 (citations omitted). Thus, "it is reasonable to assume that Congress excluded 'seaman' and 'railroad employees' from the FAA for the simple reason that it did not wish to unsettle established or developing statutory dispute resolution schemes covering specific workers." *Id.* In light of the textual and legislative history of the FAA, then, the Supreme Court in *Circuit City* held that the FAA's exemption clause was confined to the employment contracts of transportation workers only, a category which necessarily included those workers specifically enumerated in § 1, seamen and railroad employees.

Beyond *Circuit City,* the prior decisions of the appellate courts (upon which *Circuit City's* holding is largely premised) also compel the conclusion that § 1 applies to all seamen and railroad employees. Confronted with the identical question posed in *Circuit City,* the vast majority of appellate courts similarly explored the text and legislative history of the FAA, and concluded that the FAA's exclusion clause must be narrowly construed to extend only to workers who, like the already enumerat-

ed classes of seamen and railroad workers, are directly involved in the interstate transportation of goods. *See, e.g., Patterson v. Tenet Healthcare,* 113 F.3d 832, 835–36 (8th Cir.1997) (suggesting that the specific inclusion of seamen and railroad workers would have been unnecessary if the phrase "any other class of workers engaged in foreign or interstate commerce" extended to all workers whose jobs have any effect on commerce); *Asplundh Tree Expert Co. v. Bates,* 71 F.3d 592, 601 (6th Cir.1995) ("The meaning of the phrase 'workers engaged in foreign or interstate commerce' is illustrated by the context in which it is used, particularly the two specific examples given, seamen and railroad employees, those being two classes of employees engaged in the movement of goods in commerce."); *Tenney Eng'g v. United Elec. Radio & Machine Workers of America,* 207 F.2d 450, 452 (3d Cir.1953) (determining that seamen and railroad workers "were engaged directly in commerce," and that the intent of § 1 was to include only those other classes of workers who were "likewise engaged directly in commerce"). The Court finds it more than ironic that Defendant cites to these very same appellate cases, and quotes some of the very same language from these cases, yet manages to contrive a contrary interpretation of § 1. An informed reading of these cases and *Circuit City,* coupled with a minimal knowledge of the historical backdrop under which the FAA was enacted, mandate the conclusion that *all* seamen and railroad employees, as workers directly involved in the interstate transportation of goods, are specifically excluded from coverage under the FAA pursuant to 9 U.S.C. § 1.

■ In a final effort to convince this Court that § 1 contemplates only seamen and railroad employees actually involved in the movement of goods, Defendant refers to *Dole v. Petroleum Treaters, Inc.,* 876 F.2d 518 (5th Cir.1989), a case in which the Fifth Circuit held that oil well service em-

ployees, who were "seamen" under the Jones Act, were not "seamen" within the meaning of the Fair Labor Standards Act ("FLSA"). *Id.* at 524. As Defendant is well aware, the Fifth Circuit in *Dole* was addressing an entirely disparate issue from that presented in the instant case. The dispositive inquiry in *Dole* was whether the term "seamen" assumed a different meaning under the Jones Act, as compared to the FLSA. After examining the history and purposes underpinning both acts, the Fifth Circuit determined that Congress intended a broader definition of "seamen" under the Jones Act, so as to maximize the scope of remedial coverage to as many individuals as possible, while the FLSA was directed mainly at fair compensation, such that the term "seamen" was circumscribed much more narrowly to minimize the number of people who would lose the FLSA's protection. *Id.* at 522–23. Although *Dole* in no way addresses the FAA or its exclusion clause, Defendant attempts to extrapolate some attenuated analogy between *Dole* and the present case, implying that the more limited definition of "seamen" attributable to the FLSA should also be ascribed to the FAA.

The Court finds *Dole* to be distinguishable on several bases. In addition to evaluating the history and purpose of the FLSA, the Fifth Circuit in *Dole* was relying upon the Secretary of Labor's explicit interpretation, as well as the structure and wording of the FLSA exemption clause to support a more restrictive definition of "seamen." *See id.* at 521–23. In the context of the FLSA *only,* the Secretary of Labor had consistently defined the term "seamen" as employees who perform a service "rendered primarily as an aid in the operation of [a] vessel as a means of transportation ..." *See id.* at 521 (citing 29 C.F.R. § 783.31) (noting that the Department of Labor's findings "are entitled to great weight by the courts"). Further-

more, the wording of the FLSA exemption clause, which referred to "employees employed as seamen," demonstrated a congressional intent to consider the employee's actual employment function in determining seaman status. *Id.* at 523. In the case at hand, however, there exists no comparable administrative interpretation, structural or textual support, much less historical or legislative history tending to show that the FAA contemplated a simi-

larly confining interpretation of seamen. In contrast, the language in *Circuit City* and related cases, as well as the historical development of seamen status in admiralty and maritime law, seem to imply the opposite result.[2] Perhaps for this very reason, Defendant is unable to cite a single authority supporting its narrow view of seamen. There is absolutely no indication that the FAA envisioned a more re-

**2.** Courts have acknowledged that the legislative record regarding the § 1 exemption is sparse and therefore generally unhelpful. *See Circuit City,* 532 U.S. at 119, 121 S.Ct. at 1311; *Tenney Eng'g,* 207 F.2d at 452. Despite this paucity of legislative history, the Supreme Court in *Circuit City* postulated that seamen were exempt from the FAA because other federal law embodied in the Shipping Commissioners Act of 1872 ("SCA"), 17 Stat. 262, already provided for the arbitration of seaman's disputes with their employers. 532 U.S. at 120–21, 121 S.Ct. at 1312. Based on this dicta in *Circuit City,* Defendant contends that the FAA excludes only those seamen contemplated under the SCA, which defines a seaman as a person "who shall be employed or engaged to serve in any capacity on board" any "vessel navigating on any sea or channel, lake or river." 17 Stat. 262, 46 U.S.C. § 651 (repealed). As such, Defendant argues that Plaintiff is not a seaman under the SCA or the FAA.

The Court rejects Defendant's summary leap of logic. First, as the Supreme Court expressly recognized, the exact legislative underpinnings of the FAA's exemption clause are unclear. In fact, there appears to exist some support for the notion that § 1 was drafted to appease the demands of the seamen's unions. *See Tenney Eng'g,* 207 F.2d at 452 (citing the union's objection that "seamen's wages came within admiralty jurisdiction and should not be subject to an agreement to arbitrate"). If § 1 was intended to protect seamen from arbitration agreements under the FAA, the Court's ruling would be justified on the basis that legislation enacted for seamen's benefit should be liberally construed in their favor since they are wards of the admiralty court. Even assuming, however, that seamen were excluded from FAA coverage based solely on the existence of an arbitration provision in the SCA, the Court

disagrees that the precise seamen contemplated under the SCA must necessarily comport with those under § 1. The SCA was passed in 1872, the Jones Act in 1920, and the FAA in 1925. Although none of these acts expressly defined the term "seamen," it is reasonable to infer that each act incorporated the definition of seamen as understood at the time of its passage, which was relatively static during this period of time. Between 1926–1958, seaman status was heavily litigated under the Jones Act, and the concept of a Jones Act seaman expanded dramatically. Soon thereafter, courts commenced adopting and applying the Jones Act criteria for seaman status in a wide variety of maritime contexts, including unseaworthiness and maintenance and cure. *See* David W. Robertson et al., *Admiralty and Maritime Law in the United States* 240 (2001). Of particular relevance here, in cases where a Jones Act seaman has sought exemption under § 1 of the FAA, the Court is unaware of any panel that has attempted to draw a distinction between a Jones Act seaman and a seaman under § 1. Although the Court recognizes that the FAA does not specifically incorporate the Jones Act, this omission is not particularly relevant since the FAA also does not reference any other statutes as controlling. *See Dole,* 876 F.2d at 523 (determining that the FLSA's lack of reference to the Jones Act in defining exemptions was significant because the FLSA specifically mentioned several other statutes). In light of these factors, and in the absence of any persuasive legislative, textual, or other reason for delineating seaman status disparately in this case, the Court finds that the criteria for determining seaman status under the Jones Act should apply with equal vigor to § 1, such that a seaman under the Jones Act is also a seaman for the purposes of exemption under § 1 of the FAA.

strictive class of seaman than the Jones Act, and there is no dispute that Plaintiff Cox was a Jones Act seaman at the time of his alleged accident. Accordingly, this Court refuses to override the overwhelming consensus in *Circuit City* and other case law on the mere basis of an unsubstantiated conjecture. Moreover, even if this Court were to accept Defendant's interpretation of "seamen", this would not alter the Court's ultimate analysis since Defendant has failed to argue, much less present an iota of evidence demonstrating, that Plaintiff does not satisfy the more limited definition of "seamen" under the FLSA. Accordingly, the Court finds that Plaintiff's employment contract with Defendant, including the supposed arbitration agreement, is not properly governed by the FAA.

■■■■ Having determined that Plaintiff is exempt from the FAA's coverage as a result of his seaman status, the Court is sufficiently satisfied that Defendant's Motion must fail. However, in the alternative, the Court queries as to whether Plaintiff ever entered into an arbitration agreement with Defendant at all. Defendant argues that the mailing and assumed receipt of the DRP adequately establishes Buckley's acceptance of the terms of the DRP, including its binding arbitration provision. Portraying the DRP as a permissible contractual modification of the at-will employment relationship between itself and Buckley, Defendant believes that Buckley's continued employment with Nabors after receiving the DRP constitutes acknowledgment and acceptance of the DRP under Louisiana law.[3] The Court agrees with Defendant that an unsigned written arbitration agreement may be val-

id under the FAA. *See Valero Ref., Inc. v. M/T Lauberhorn,* 813 F.2d 60, 64 (5th Cir.1987) (citations omitted). The Court further recognizes that the mailing of a document may create a presumption that such document was received. *See Conoco, Inc. v. Tarver II,* 600 So.2d 889, 890 (La. Ct.App.1992). However, even assuming that Buckley received the DRP, there is absolutely no evidence that Buckley actually read, or, more importantly, understood the contents of the DRP. *Cf. Prevot v. Phillips Petroleum Co.,* 133 F.Supp.2d 937, 939–41 (S.D.Tex.2001) (Kent, J.) (invalidating arbitration agreements as procedurally unconscionable where the agreements were written in English and the plaintiffs could not read English). Buckley never signed or returned the acknowledgment letter enclosed in the DRP mailing, which generally would tend to indicate that an agreement had been reached. *See Stadtlander v. Ryan's Family Steakhouses, Inc.,* 794 So.2d 881, 889 (La.Ct.App.2001) ("In fact, it is well settled that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that she did not read it, that she did not understand it, or that the other party failed to explain it to her."). Additionally, there is no indication that Nabors made any other attempts to notify Buckley of the DRP and its binding arbitration clause anytime thereafter. Without more proof that Buckley actually read and understood the terms of the DRP, this Court is loath to declare that Buckley entered into a binding arbitration agreement with Nabors.

### IV.

Having carefully considered all of the relevant facts and law, the Court holds

---

**3.** Defendant asserts, and Plaintiff does not challenge, that Louisiana law governs the validity of the instant arbitration agreement because Louisiana has the most significant relationship to the arbitration agreement and

employment relationship between the Parties. For purposes of this Order only, the Court assumes that Louisiana contract law applies to the present dispute.

that Plaintiff Buckley is a seaman whose employment contract with Defendant Nabors is expressly excluded from coverage under § 1 of the FAA. The arbitration agreement alleged by Defendant, having arisen pursuant to Plaintiff's exempt employment contract, is therefore not a valid and enforceable arbitration provision under the FAA. Furthermore, and alternatively, even if the subject arbitration clause were otherwise enforceable, the Court finds that based on the record presently before it, there is no showing that Plaintiff actually entered into an arbitration agreement with Defendant. In light of all of these factors, the Court hereby **DENIES** Defendant's Motion to Compel Arbitration and to Stay or Dismiss this Action Pending Such Arbitration.

**IT IS SO ORDERED.**