362 So.2d 406 (1978)
The LEWIS STATE BANK, Appellant,
v.
ADVANCE MORTGAGE CORPORATION, a Michigan Corporation, Appellee.
No. II-402.
District Court of Appeal of Florida, First District.
August 24, 1978.
Rehearings Denied October 10, 1978.
*407 John D. Buchanan, Jr., of Henry, Buchanan, Mick & English, M. Stephen Turner, of Thompson, Wadsworth, Messer, Turner & Rhodes, Tallahassee, for appellant.
J. Michael Huey, of Huey, Camper & Guilday, Tallahassee, for appellee.
ERVIN, Judge.
Lewis State Bank and Warrington Village Apartments, Ltd., appeal a final summary judgment entered in favor of third party defendant Advance Mortgage Company.
Warrington, a limited partnership, obtained a construction loan from Advance in the amount of $2,789,500 for the purpose of developing an apartment complex in Pensacola, Florida. The construction loan was insured by the Department of Housing and Development (HUD). One of HUD's conditions to the issuance of insurance was that two percent of the face amount of the loan, or $55,790, be deposited with Advance as a working capital deposit. Warrington made a cash deposit at the time of closing. Later Warrington requested that Advance obtain permission from HUD to permit Warrington to substitute letters of credit for the cash deposit. HUD allowed the substitution provided that Advance furnish it with a certification stating that the letters were unconditional and irrevocable and issued by a banking institution. At Warrington's request, on June 16, 1972, the Bank issued an irrevocable and unconditional letter of credit in the amount of $55,790 to Advance as beneficiary with an expiration date of August 10, 1973. Upon receipt of the letter of credit, Advance returned the cash deposit to Warrington.
Prior to the letter's expiration, on June 17, 1973, Advance wrote Warrington advising that it was Warrington's responsibility to maintain the letter in effect until such time as the deposit was no longer required by HUD. Advance also requested Warrington to arrange for an extension of the letter for a period of no less than 150 days. Warrington failed to respond to Advance's requests and Advance contacted the Bank advising that unless the letter of credit was extended, Advance would sight draft it.
On August 9, 1973, following Advance's request, the Bank replied, "We hereby extend our letter of credit ... to February 1, 1974... ." It further advised that it incorporated into the original letter of credit certain requirements that no draws be made for anything other than working capital as defined by correspondence from Advance to the Bank. The Bank requested that any claim for payment be accompanied by a letter specifying the expenses which should be paid from the funds disbursed. On August 14, 1973, Advance furnished to the Bank a definition of working capital.[1]
*408 On January 8, 1974, after the original note between Warrington and Advance had gone into default the previous November, Advance requested Warrington to obtain another extension of the letter which was to expire on February 1, 1974. When it received no response from Warrington, Advance, on January 22, 1974, sight drafted the letter. The Bank refused to honor the demand without additional information as to the use of the funds. The information was provided[2] and on January 25, 1974, Advance again sight drafted the letter. On January 30, 1974, the Bank honored the draft and paid Advance the sum of $55,790. The Bank later filed a claim against Warrington on the promissory note in the sum of $55,790. Warrington filed an answer and third party complaint against Advance. The Bank also filed a cross-claim against Advance contending that Advance was unjustly enriched resulting from its sight draft of the letter since it failed to comply with the terms of the underlying correspondence which it alleged modified the original letter.
The lower court granted summary judgment in favor of Advance, holding that no new letter of credit was ever issued by the Bank; that the original letter was simply extended for a longer term; that the purpose of the correspondence and discussions between Advance and the Bank was to define the term "working capital deposit"; that the certification issued January 25, 1974 by Advance was not a documentary letter, and that the letter of credit, sight drafted by Advance, remained an irrevocable, unconditional letter which had not been altered to a conditional or documentary letter.
Appellants argue that the letter of credit was indeed altered; that Advance did not comply with the terms set out in the letter of August 14, 1973, or the letter of January 25, 1974, certifying that certain payments would be made once the letter of credit was honored. Since, contrary to the terms of the certification, the sums specified to be paid were in fact not so paid, the terms of the conditional letter of credit were not complied with, resulting in breach of the contractual provisions and unjust enrichment to Advance.
The crucial question for our consideration is whether it was the parties' intention that the letter be modified so that no draws could be made against it unless the terms of the alteration were strictly complied with,[3] or whether it was their intention that the letter be unchanged and that the underlying correspondence pertaining to "working capital deposit" was, as the lower court held, merely to define the term. *409 We find nothing within the provisions of the Uniform Commercial Code which explicitly covers the situation involved. Certain sections, however, state general rules of construction to be applied to letters of credit.
Section 675.103, Fla. Stat. (1977) (UCC § 5-103), requires that a letter of credit clearly state whether it is revocable or irrevocable. "[I]n the absence of such statement [it] shall be presumed to be irrevocable." The UCC comment to Section 5-103 observes that neither the definition of the letter of credit or any other section of the article concerns the issue of when a credit, not clearly labeled as either revocable or irrevocable, falls within one or the other category, and the issue is left to the courts for decision in the light of the facts, general law and general provisions of the code on course of dealing and usage of trade.[4] Moreover the comment to Section 5-102(3)[5] states that it recognizes in the present state of the law no statute can effectively codify all the possible law of letters of credit; therefore the second sentence of subsection (3) "makes explicit the court's power to apply a particular rule by analogy to cases not within its terms, or to refrain from doing so." The comment continues: "[U]nder Section 1-102(1)[[6]] such application is to follow the canon of liberal interpretation to promote underlying purposes and policies."
As a general rule, the interpretation of a written contract is a question of fact. See Dobson v. Masonite Corp., 359 F.2d 921, 923 (5th Cir.1966); 3 Corbin, Contracts, § 554 at 219 (1960). Nevertheless, agreement on this point does not compel the conclusion that a jury question is always created when parties supposedly differ regarding the meaning of terms used in a writing. Professor Corbin makes the following analysis:
The question of interpretation of language and conduct  the question of what is the meaning that should be given by a court to the words of a contract, is a question of fact, not a question of law... . There is no "legal" meaning, separate and distinct from some person's meaning in fact.
We must bear in mind, however, that this question of fact is like other questions of fact in this: it may be a question that should be answered by the judge rather than by the jury. In cases in which it is so answered, it is probable that the interpreting judge may say that interpretation of language is a "question of law for the court."
* * * * * *
... If the words of agreement, whether oral or written, are definite and undisputed, and if there is no doubt as to the relevant surrounding circumstances, the interpretation of the words is ordinarily held to be a matter for the court. Even if these circumstances are in dispute, the evidence as to what they were may be so clear and convincing that the court would set aside a verdict contrary to that evidence. The result of these rules is that in very many cases where the contract is in writing the interpretation of its language has been held to be for the court and not for the jury. Id. at 219-25.
*410 We agree with the trial court that under the circumstances of this case there was no genuine issue of material fact left to be resolved. All the parties were aware on June 16, 1972, when the Bank issued its irrevocable, unconditional letter of credit that the purpose of the letter's terms was to comply with HUD's requirement that the letter be unconditional and irrevocable, and that the sum pledged was to provide for a working capital deposit. The finding by the lower court that the purpose of the correspondence was to define and explain "working capital deposit" is entirely supported by the record. Indeed, the letter of August 14, 1973, that appellants contend defined the conditions which extended the letter of credit, quoted word for word from HUD's commitment for insurance of advances, which was in existence at the time the first letter issued.
The lower court's interpretation of the contract was in no way inconsistent with the actions of the Bank's employees. Mr. McDaniel, senior vice-president for the Bank, testified that the letter of August 14, 1973 from Advance clarified the term "working capital under the federal housing administration's commitment for insurance of advances... ." Before honoring Advance's sight draft, Robert Wadley, the Bank's former vice-president, contacted HUD officials concerning Advance's expenses pertaining to the working capital clause and was advised those expenses were as contemplated in HUD's commitment. The court's interpretation of the letter that it remained irrevocable and unconditional is unquestionably supported by the evidence. The circumstances surrounding the transaction lead inevitably to the conclusion it was the parties' intention "to permit the continued expansion of commercial practices through ... agreement." Section 671.102(2)(b).
It is true that Warrington did not expressly consent to the extension of the letter of credit prior to the Bank's agreement to extend it on August 9, 1973. The original letter, which had an expiration date of August 10, 1973, had to be presented for payment by that date or would have been rendered ineffective. 9 CJS Banks and Banking § 178c (1938). Section 675.106(2) (UCC § 5-106(2)) provides that "unless otherwise agreed once an irrevocable credit is established as regards the customer it can be modified or revoked only with the consent of the customer... ." Does the failure of the customer, Warrington, to consent to the extension before its issuance invalidate it? Warrington admits that it acquiesced in the extension subsequent to the issuance of the extended letter. In its brief, Warrington states: "At minimum, Warrington concurred in the extension in the bank's action. Neither the extension itself nor the fee was protested, and Warrington gave a new promissory note to evidence the obligation under the extension." Under general principles of equity it is clear that Warrington would be estopped by its later acquiescence from arguing it was excused from the terms of the extension on the ground that it did not expressly consent to the extension prior to the issuance. See 12 Fla.Jur., Estoppel and Waiver, § 44 (1957). While UCC Article 5 does not expressly make provision for circumstances to which waiver or estoppel might apply, the comment to Section 5-104 states that "[q]uestions of mistake, waiver or estoppel are left to supplementary principles of law." Additionally, Section 671.103 (UCC § 1-103) generally provides that unless displaced by particular provisions of the code, principles of law and equity and the law relative to estoppel, fraud, misrepresentations, etc., shall supplement the code's provisions. Consequently general principles of equity, particularly those relating to waiver and estoppel, apply here. As a result Warrington, by its subsequent acts, is now estopped from denying it consented to the letter of extension.
AFFIRMED.
MILLS, Acting C.J., and MELVIN, J., concur.
NOTES
[1] The letter stated in part:

In accordance with our telephone conversation, I wish to define the uses of the Working Capital Letter of Credit on the captioned project, as stated in the Federal Housing Administration's "Commitment for Insurance of Advances", paragraph (j)(2):
Deposit to meet cost of equipping and renting the project subsequent to completion of the entire project or units thereof, and to be applied to taxes, mortgage insurance premiums, property insurance premiums and assessments required by the terms of the mortgage accruing subsequent to initial endorsement of the mortgage for insurance, and not included in the proceeds of the mortgage ... $55,790.00.
It is also agreed that any request for payment under this Letter will be accompanied by a letter specifying the expenses that will be paid with funds drawn.
[2] Advance's letter of certification stated:

In connection with our Sight Draft in the amount of $55,790.00 drawn under documentary letter of credit dated June 16, 1972, we hereby certify to you that these funds shall be used in connection with FHA Project No. 063-44039 LDP located in Warrington, Florida, known as Warrington Village Apartments, LTD.
Be advised that payments will be made as follows:

 FHA required Mortgage Insurance
 Premium $21,799.97
 Escrows from December 1, 1973
 to February 1, 1974 Insurance,
 MIP and Reserve 13,557.66
 Real Estate tax escrow account
 for taxes due in year following
 completion of construction 2,475.77
 Balance for expenses for cost of
 equipping and renting the project
 subsequent to completion
 and other expenses for escrow
 accounts under terms of FHA
 Regulations on Working Capital 17,956.60
 __________
 $55,790.00

[3] Section 675.109(2), F.S. (1977), requires the issuing bank to examine the documents with care in order to assure they appear regular on their face.
[4] "A letter of credit is governed by the same general principles of law as are all other contracts in writing." 50 Am.Jur.2d, Letters of Credit, § 13, p. 409 (1970).
[5] Section 675.102(3) (UCC 5-102(3)) provides:

This chapter deals with some but not all of the rules and concepts of letters of credit as such rules or concepts have developed prior to this act or may hereafter develop. The fact that this chapter states a rule does not by itself require, imply or negate application of the same or a converse rule to a situation not provided for or to a person not specified by this chapter.
[6] Section 1-102 states in part:

(1) This code shall be liberally construed and applied to promote its underlying purposes and policies.
(2) Underlying purposes and policies of this code are:
(a) To simplify, clarify and modernize the law governing commercial transactions;
(b) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
(c) To make uniform the law among the various jurisdictions. (e.s.)