932 So.2d 235 (2005)
ABERDEEN GOLF & COUNTRY CLUB, Appellant,
v.
BLISS CONSTRUCTION, INC., Appellee.
No. 4D04-2545.
District Court of Appeal of Florida, Fourth District.
September 7, 2005.
*236 Mara Shlackman and Hinda Klein of Conroy, Simberg, Ganon, Krevans & Abel, P.A., Hollywood, for appellant.
Kenneth G. Spillias and Kevin S. Hennessy of Lewis, Longman & Walker, P.A., West Palm Beach, for appellee.

AMENDED OPINION
FARMER, J.
We have a nonfinal order refusing to compel arbitration. The dispute arose from an aborted contract for the construction of a new $2 million facility at a private club. The contract between the owner of the club and the general contractor (GC) contained an alternative dispute resolution (ADR) provision that included arbitration. When the owner terminated the contract before completion, the GC commenced litigation and alleged that the owner's premature termination caused damages. The owner responded with a demand for arbitration. The trial judge found that the owner had forfeited any right to arbitration by its conduct leading up to the GC's suit. We affirm.
Like all contracts, each arbitration agreement is unique. Although it may employ some standard terms, the contract must be construed and understood in light of its whole text, context, structure and purpose. As with all contracts, the entire undertaking must be considered.
Some arbitration provisions are intended to operate as an irrevocable substitute for litigation in court. These survive full performance by one party, leaving only the other party's covenant for future dispute. For example, an arbitration provision in the purchase of a product, say an automobile, may be intended to apply even after the buyer has fully performed by *237 payment and all that remains is the seller's warranty. In that instance arbitration may be intended as a complete alternative to proceedings in a court on warranty claims surviving the closing.
In other contracts, however, performance may involve many tasks over a long duration toward a single defined goal. One example is the construction of a commercial building. It is impossible to build anything substantial overnight or all alone. The complexity of a substantial commercial edifice requires multiple vendors completing an interrelated series of dependent tasks. The participation of many must be carefully coordinated, because the work of one hinges on the finished work of another. Yet there are a thousand ways in this relay of goods and services for time to be stolen. Here arbitration may have a different use: it may instead be intended as a means of postponingeven if not ultimately avoidinglitigation in court while the parties make progress toward their contractual goal. The issue is whether this case involves this latter kind instead of the former.
It is unlikely that many $2 million commercial construction projects have been finished without conflicts during progress. The owner of real property and a GC share two primary concerns. Time and money.[1] Disputes arising during construction may result in lost time. They structure their contract so the whole job does not come crashing to a halt with every dispute. They aim to keep the project going and to avoid wasting time and money in litigation to resolve disputes about individual parts of the plan or the specific tasks. Litigation is ill-suited to resolve them because courts spend time in ways horrifying commercial parties. This is not a criticism, for we are deliberative institutions bound by procedures allowing parties to make their cases fully. So in a construction contract, the parties may choose an ADR system whose real purpose is for construction to continue through the dispute.
The ADR provision in this agreement may be briefly outlined. It starts with an umpire of sorts, the architect[2] and, if a party disagrees with his decision, then to mediation[3] and, if nothing works to the satisfaction of all, to arbitration.[4] Notably *238 this ADR provision does not specify anywhere that arbitration, as such, is a condition precedent to litigation.
That this ADR provision was meant to function during the progress of the contract is seen in certain key provisions, all of which must be read as part of a single piece. One section requires any dispute to be initiated by notice to the architect within 21 days after it has occurred and, in any event, not later than 30 days before the final payment. This is obviously meant to insure that all disputes will be resolved before completion, or laid on the table when it comes time for the owner to make the final payment on the contract price, perhaps with an adjustment for any unresolved dispute. Another section emphasizes that "[p]ending final resolution of a claim . . . the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract documents." [e.s.] In short, the contract requires both sides to continue to perform through disputes, with the goal that most things will be resolved as they arise or with the final payment. Critically, another section of the contract expressly limits the grounds for either party terminating the entire contract before completion. Essentially the GC may terminate if the owner fails to make a draw payment certified as due by the architect. The owner may terminate if the GC and the subs fail to carry on construction diligently.
Significantly the contract specifies that, after notice from the complaining party, an initial decision by the architect is a condition precedent "to mediation, arbitration or litigation of all Claims." [e.s.] If the parties meant for arbitration to supplant all litigationeven after a termination before full completionthey would not have inserted litigation, the emphasized word, because their intent then would have been to eliminate litigation entirely. Again, the arbitration clause does not state that it is a precondition to litigation. In fact, nothing in the contract specifies that the arbitration provision is irrevocable and replaces all litigation in court. Altogether, these specific provisions and omissions make clear that this ADR system was meant to function in place of the courts while progress was being made on the contract.
From this whole text, context and structure, the only reasonable construction is that the ADR provision was not meant to survive an absolute termination of the contract before completion. Any total termination of the contract before the clubhouse was built would obviously be the utter negation of the very purpose of the contract in the first place, and thus also the rationale behind an ADR provision designed to speed dispute resolutions during construction in order to bring about a successful completion of the contract. If either party terminated, all bets would be off and either could have its day in court.
The dispute that ended in the utter destruction of the agreement began with the GC's discovery of mold in part of the old clubhouse being rebuilt. As the contract requires, the GC gave notice to the architect and claimed that the presence of the mold should change the approved schedule and increase the contract price for successful completion of the clubhouse. The architect confirmed the mold and agreed that it had caused delays that could affect the price.
If the owner disagreed with the architect's decision on mold, the owner was *239 required under the contract to initiate mediation and, that failing, an arbitration proceeding to resolve the issue while the whole project carried on. The contract also specified that arbitration must be initiated by filing the claim with the American Arbitration Association. But meanwhile the owner was barred by the contract from withholding any draw payments already certified as due.
The owner decided not to follow the contract's ADR provisions.[5] It rolled out the ultimate weapona refusal to pay draws then certified as due by the architect and declared a termination of the whole deal. The owner refused further performance entirely, refused to make a draw payment of nearly a quarter of a million dollars then due, and "fired" the GC. Although several weeks later the owner wrote the GC that it wanted arbitration of the dispute, until this litigation was filed even later the owner had never initiated such proceedings in the manner prescribed by the contract.
Obviously it is unreasonable to suppose that an arbitration provision meant to resolve disputes while work continues has any application to a termination of the entire contract before completion. In short, because of the owner's refusal to resort to the ADR and the owner's termination well short of any hope of completion, the ADR provision simply failed of its essential purpose. See Varner v. B.L. Lanier Fruit Co., Inc., 370 So.2d 61 (Fla. 2d DCA 1979) (where circumstances cause a remedy to fail of its essential purpose, remedy may be had as otherwise provided by law).
To be sure, the issue was framed in the trial court as one of waiver.[6] The GC argued that the owner waived arbitration by refusing to follow the contract's ADR provision as to the mold issue. The trial court obviously accepted the GC's position that the owner's pre-lawsuit conduct barred it from claiming arbitration instead of court litigation. See Raymond James Fin. Servs., Inc. v. Saldukas, 896 So.2d 707 (Fla.2005) (waiver of the right to arbitrate may consist of conduct implying a voluntary and intentional relinquishment of a known right).
In Raymond James Financial Services, the supreme court explained the waiver of arbitration provisions thus:

*240 "The right to arbitration, like any contract right, can be waived. The [United States] Supreme Court has made clear that the `strong federal policy in favor of enforcing arbitration agreements' is based upon the enforcement of contract, rather than a preference for arbitration as an alternative dispute resolution mechanism. Thus, the question of whether there has been waiver in the arbitration agreement context should be analyzed in much the same way as in any other contractual context. The essential question is whether, under the totality of the circumstances, the defaulting party has acted inconsistently with the arbitration right." [e.s., c.o.]
896 So.2d at 711; see also E.E.O.C. v. Waffle House Inc., 534 U.S. 279, 289, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (purpose of federal arbitration statute was to place arbitration agreements on the same footing as any other contract); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (same).
Thus arbitration provisions and their waiver must be construed and enforced no differently than all contracts are construed and enforced. We agree that, after the architect's initial mold decision, the owner's refusal to initiate mediation as a precondition to arbitration and to comply with the duty to make progress payments instead of terminating the contract could be deemed a voluntary and intentional relinquishment of the known right to arbitration. The trial court's decision fits well within the invocation of traditional contract law principles in Raymond James Financial Services.
According that decision the initial presumption of correctness, as we must, we think the trial court's decisionthat the owner refused to follow the contract ADR after the architect's initial mold decisioncould also be upheld under another legal theory, another standard contract principle aptly fitting the circumstances. It is settled contract law in Florida that a breach by anticipatory repudiation allows the nonbreaching party to terminate his own performance and bring litigation for damages. In Hospital Mortgage Group v. First Prudential Development Corp., 411 So.2d 181 (Fla.1982), the supreme court adopted the RESTATEMENT position, saying "the nonbreaching party is relieved of its duty to tender performance and has an immediate cause of action against the breaching party." 411 So.2d at 182; RESTATEMENT (SECOND) OF CONTRACTS § 253 (1979); see also Poinsettia Dairy Prods., Inc. v. Wessel Co., 123 Fla. 120, 166 So. 306 (1936) (same). In this case, we should be clear in understanding that the owner's firing of the GC effectively ended the construction contract. Thus the owner "unequivocally terminated" the entire agreement. The owner's repudiation empowered the GC to forego his own performance of the contract's various provisionsincluding an ADR provision designed to ensure full performance by the ownerand sue for damages in court.
Waiver is certainly an apt characterization when a seller of an auto with a surviving warranty proceeds to defend on the merits after the buyer files suit for breach. But here before it terminated the contract entirely, the owner forswore complying with any of the contract's ADR provisions to allow successful completion. The owner rejected mediation, followed by arbitration, to resolve the architect's mold decision, improperly refused to make certified draw payments, and simply called a halt to the entire contract.[7] The ADR provision is *241 just one part of the contract's provisions leading to a successful completion, and it does not specify that it survives a premature termination. Without a survival clause, the ADR provision went down with the whole.
The contract's ADR system was like the rifle shot before the nuclear bomb. If only rifles were being fired, final completion was still possible. But the owner chose the nuclear option of total war rather than the contract's system of less drastic, alternative resolution. Once the nuclear bomb was dropped, any resolution was not for this contract's ADR meant to avoid total war.
In repudiating the ADR, the owner should not be heard in litigation to claim the benefit of an ADR provision it had rejected so clearly and unequivocally. The owner's failure to initiate arbitration, its refusal to make payment due, and its cancellation of the whole agreement, all left the GC with no choice but to commence litigation to recover any damages caused by an improper nonpayment and repudiation.
Affirmed.
WARNER, J., concurs.
GUNTHER, J., dissents with opinion.
GUNTHER, J., dissenting.
I respectfully dissent. Neither Aberdeen Golf & Country Club nor Bliss Construction, Inc. has ever contended, whether in the trial court or on appeal, that the contract at issue was terminated, destroyed, repudiated, or otherwise abandoned, so as to prevent the operation of its dispute resolution procedures. Significantly, not only did Bliss never assert that Aberdeen could not invoke the dispute resolution procedures due to the termination of the contract, it has sought to rely on its interpretation and application of those very dispute resolution procedures to support its claim that Aberdeen waived its right to arbitration by failing to first comply with the procedures. Such a position is fundamentally inconsistent with a contention that the contract was abandoned so as to prevent the operation of the dispute resolution procedures.
Additionally, the majority's conclusion that the contract was terminated presupposes one of the legal issues to be considered and resolved by the trial court, namely Bliss's claim for breach of contract based on Aberdeen's termination of Bliss. Thus, the majority's conclusion places Aberdeen in an untenable position at trial. Because the evidentiary record and decision were limited to the issue of arbitration, this Court's opinion also should be so limited.
*242 Aberdeen Golf & Country Club appeals the denial of its Motion to Dismiss Complaint and Compel Arbitration, contending that it did not waive its right to arbitration. I would reverse because I find that neither Aberdeen nor Bliss Construction, Inc. complied with the requirements of the dispute resolution procedure set forth in the standard-form American Institute of Architects contract executed by the parties.
Aberdeen entered into the contract with Bliss for addition and renovation work on Aberdeen's clubhouse. After the project had begun, Bliss discovered that the clubhouse was contaminated by mold, and that the contamination would result in construction delays and additional costs.
Pursuant to a provision of the contract, Bliss sought a decision of the architect finding that the mold contamination was a hidden condition[8] allowing for time and cost adjustments to the contract. Article 4.4.1 of the contract provides:
Claims, including those alleging an error or omission by the Architect but excluding those arising under Paragraph 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect.
The architect determined that the mold was a hidden condition. To reach the conclusion that the mold was a hidden condition, the architect necessarily made an implicit finding that Bliss did not cause the mold problem. This is so because damage that a party causes cannot reasonably be considered a hidden condition unknown to it, especially where such damage would not be subsurface in nature or an unusual physical characteristic of the site. Aberdeen responded to the decision of the architect by, inter alia, terminating Bliss as its contractor, purportedly for cause under the contract due to its belief that substandard construction practices employed by Bliss caused the mold problem, and ceasing progress payments.
As the dispute escalated, Aberdeen sent a letter to Bliss requesting mediation and arbitration if mediation was unsuccessful; however, mediation, at least as contemplated by the contractual dispute resolution procedures, was never undertaken by the parties. Bliss responded by filing a complaint in circuit court against Aberdeen. Bliss included counts for fraudulent misrepresentation, negligent misrepresentation, rescission, breach of contract, and slander. The fraudulent misrepresentation, negligent misrepresentation, and rescission claims explicitly relate to the mold dispute. The breach of contract claim addresses the mold dispute by raising Aberdeen's termination of Bliss and cessation of progress payments, which resulted from the mold problem. The slander claim, which was never addressed by the trial court, focuses on statements allegedly made by Aberdeen in the aftermath of the *243 mold problem about the quality of Bliss's work.
Aberdeen responded to Bliss's lawsuit by filing a demand for arbitration with the American Arbitration Association (AAA). Aberdeen raised claims for breach of contract, negligence, and civil conspiracy against Bliss. The breach of contract claim squarely addresses the mold problem by discussing the drying-in process, which a prior letter from Aberdeen to Bliss alleged was improperly completed and was a possible cause of the mold problem. The negligence claim refers to substandard work by Bliss just like the breach of contract claim, thereby including the drying-in process and its possible relationship to the mold problem. The civil conspiracy claim relates to the architect's report on the mold problem as discussed in the letter from Aberdeen to Bliss. Bliss's counterclaims are identical to the claims made in its complaint filed in the circuit court.
Aberdeen also filed a Motion to Dismiss Complaint and Compel Arbitration based on Articles 4.5 and 4.6 of the contract which require mediation as a condition precedent to arbitration or litigation and set forth the mediation and arbitration steps of the contractual dispute resolution procedure. Article 4.5.1 provides:
Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5, shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal proceedings by either party.
Article 4.6.1 provides:
Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Paragraph 4.5.
It should be noted that the language of Article 4.6.1 does not explicitly make arbitration a condition precedent to litigation, but that Article 4.6.2 mandates that "[c]laims not resolved by mediation shall be decided by arbitration."
Bliss then amended its complaint to include a count for foreclosure of a construction lien filed in the wake of the mold dispute and filed a Memorandum in Opposition to Defendant's Motion to Dismiss Complaint and Compel Arbitration. Bliss asserted that Aberdeen waived its right to arbitration by, inter alia, failing to itself seek a decision of the architect under the dispute resolution procedures of the contract as a means to resolve the mold dispute.
The trial court held a hearing on the Motion to Dismiss Complaint and Compel Arbitration, at which Bliss acknowledged that all of its claims, except possibly the slander claim, were properly subject to arbitration under the contract. However, Bliss contended that Aberdeen waived its right to seek arbitration, that it had improperly requested mediation and arbitration by letter to Bliss rather than by demand to the AAA, and that it had taken steps inconsistent with the right to arbitrate so as to further waive that right. The trial court denied the Motion to Dismiss Complaint and Compel Arbitration.
"[T]he standard of review applicable to the trial court's construction of [an] arbitration provision, and to its application of the law to the facts found, is de novo." *244 Gainesville Health Care Ctr., Inc. v. Weston, 857 So.2d 278, 283 (Fla. 1st DCA 2003); see also Stewart Agency v. Robinson, 855 So.2d 726, 728 (Fla. 4th DCA 2003)("A trial court's decision regarding the validity of an arbitration clause is a matter of contract interpretation subject to de novo review."). However, once the arbitration clause is construed and applied, the question of waiver of the clause is one of fact, and the trial court's answer to the question is subject to review for competent, substantial evidence. See Marine Envt'l Partners, Inc. v. Johnson, 863 So.2d 423, 426 (Fla. 4th DCA 2003).
"[T]here are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." Seifert v. U.S. Home Corp., 750 So.2d 633, 636 (Fla.1999). In the case at bar, the parties recognize that the contract includes an arbitration provision and that, with the possible exception of the slander claim, the claims raised in the complaint are arbitrable issues. As such, the central issue on appeal is whether Aberdeen waived its right to arbitration.
"[A]ll doubts about the scope of an arbitration agreement, as well as any questions about waivers thereof, are in favor of arbitration, rather than against it." Breckenridge v. Farber, 640 So.2d 208, 210 (Fla. 4th DCA 1994); see also Marine Envt'l, 863 So.2d at 426. However, "no party may be forced to submit a dispute to arbitration that the party did not intend and agree to arbitrate." Steve Owren, Inc. v. Connolly, 877 So.2d 918, 920 (Fla. 4th DCA 2004).
"Waiver is the intentional or voluntary relinquishment of a known right or conduct which warrants an inference of the relinquishment of a known right." Marine Envt'l, 863 So.2d at 426. "While arbitration agreements are favored, a party may waive that right if the party has knowledge of the right yet takes action inconsistent with the right." Breckenridge, 640 So.2d at 210. "A party claiming waiver of arbitration must demonstrate: 1) knowledge of an existing right to arbitrate and 2) active participation in litigation or other acts inconsistent with the right." Id. at 211. "A showing of prejudice is not required if waiver is based on inconsistent acts rather than delay in asserting one's right." Id.; see also Raymond James Fin. Servs., Inc. v. Saldukas, 896 So.2d 707, 710 (Fla.2005); Marine Envt'l, 863 So.2d at 428.
The question in the case at bar is not whether Aberdeen was aware of the right to arbitrate, but whether Aberdeen waived the right to arbitrate by engaging in acts inconsistent with that right. Such inconsistent acts could include failing to obtain a decision of the architect or to endeavor to resolve the mold dispute by mediation. This question requires consideration of the dispute resolution procedure provisions of the contract.
The first step of the contractual dispute resolution process is submission of a claim to the architect for a decision. Bliss undertook such a submission. The architect determined that the mold was a hidden condition. Although Aberdeen did not request a decision of the architect, the language of the contract does not require that the party that submitted a claim to the architect is the only one that can submit the claim to a mediator. The contract merely refers to the submission of claims to the architect being a condition precedent to the submission of claims to mediation, without specifying who must submit the claims. Although Bliss was the initial complainant in the case at bar, the architect's decision regarding the mold dispute was adverse to Aberdeen in that the mold *245 was deemed a hidden condition, and thus, not caused by Bliss, so that Aberdeen was the party most likely to seek further review of its claims regarding the mold problem. As such, I cannot conclude that based on the terms of the contract and the facts of the case that Aberdeen was required to separately submit the mold dispute to the architect before undertaking arbitration.
However, Aberdeen was required to endeavor to resolve the mold dispute by mediation prior to seeking arbitration. This is because mediation is the second step of the contractual dispute resolution process and is a condition precedent to both arbitration and litigation under the contract. But Aberdeen is not the only party in the case at bar to run afoul of the contractual dispute resolution provisions. Bliss failed to undertake mediation prior to initiating legal proceedings based on its continued dissatisfaction with Aberdeen's response to the mold problem and the decision of the architect in Bliss's favor. The claims made to the architect, to the AAA, and to the circuit court share the common nexus of the mold dispute, and more specifically, all address the cause of the mold problem, whether a hidden condition or substandard construction practices. As a result, to seek continued review of the dispute following the decision of the architect, whether through arbitration or litigation, both Aberdeen and Bliss were required to endeavor to resolve the mold dispute by mediation, a step which neither party took.
Bliss's argument that Aberdeen waived its right to arbitration is equitable in nature. See Lewis State Bank v. Advance Mortgage Corp., 362 So.2d 406, 410 (Fla. 1st DCA 1978) (waiver is a principle of equity). Although it is apparent that Aberdeen did not comply with the contractual dispute resolution procedures, I am unwilling to conclude that Aberdeen waived its right to arbitration where the party so asserting was equally remiss in its compliance with the contractual dispute resolution procedures prior to filing a lawsuit. As such, neither party is in a position to seek or receive a disposition of this case that is based on equitable principles. See McMichael v. McMichael, 158 Fla. 413, 28 So.2d 692, 693 (1947)(in cases where "both parties are at fault [equitable] relief should be withheld from both"). Furthermore, because neither Aberdeen nor Bliss satisfied the conditions precedent to litigation under the dispute resolution provisions of the contract, the trial court should have granted the motion to dismiss to allow for continued consideration of the mold dispute under these provisions. Consequently, I would reverse and remand for just such further proceedings.
NOTES
[1] In a sense they are a single concern. Time is money. The owner will probably have a construction loan, the ultimate cost of which is tied to the duration of construction. The GC may also be working off an operating capital loan to advance the costs of material and labor. The more the GC pays in interest on the loan, the less its profit. Even without an operating capital loan, the longer the GC's money is tied up in material and labor, its earnings are diminished. Consequently their agreement seeks to reduce the cost of money.
[2] "Claims ... shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect." Art. 4.4.1 (AIA form 1997).
[3] "Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5, shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal proceedings by either party." Art. 4.5.1.
[4] "Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Subparagraphs 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Paragraph 4.5." Art. 4.6.1.
[5] The evidentiary record we have been given is limited to the proceedings on the motion to compel arbitration. Our decision relates only to the issue of arbitration. Nothing we say in resolving this appeal should be taken as the law of the case on any issue involved in the merits of the pending claims or defenses. Any collateral estoppel effects of facts established in the course of deciding the motion to compel arbitration are for the trial judge to decide in the first instance.
[6] The dissent argues that the GC has never contended that the owner's termination of the contract bars it from asserting the ADR provision. It is true that the GC has not used the words "terminated" or "repudiated", but it has definitely argued that before suit was filed the owner "engaged in conduct inconsistent with the exercise of the right to arbitrate . . . or properly preserve or exercise that contractual right." Appellee's Brief, at 12. The fact that the GC's brief does not specifically argue the theory of breach by anticipatory repudiation is inconsequential. A trial court's decision will be upheld on appeal if any legal theory supports it. Applegate v. Barnett Bank of Tallahassee, 377 So.2d 1150, 1152 (Fla. 1979). Applegate requires us to consider any theory on appeal that would sustain the trial court's decision, so long as it is consistent with the facts on which the decision was based. In this case, the trial court did not state the actual basis for its decision that the GC was not required to arbitrate the dispute in place of litigation. Waiver and contract repudiation are simply corresponding legal theories for similar conduct leading to the same outcome. There is nothing inconsistent about them in the context of this case.
[7] The dissent argues that the contract ADR still required the GC to seek arbitration of the mold dispute many months after the owner had fired the GC and terminated the entire contract. With respect, this is illogical. The GC had previously and timely submitted the mold dispute to the architect and was perfectly satisfied with his decision. It was the owner who was unsatisfied with the architect's decision. Under the contract the owner had the burden to initiate mediation and arbitration within 15 days after the architect's mold decision. Instead the owner refused payment due and fired the GC. Firing the GC was a termination of the contract. Many weeks later, the owner wrote the GC that it wanted arbitration, but by then it was long past contract time for initiating these procedures. There was nothing left for the GC but to file suit for damages to recover what it is owed. In effect the dissent would deny the GC's right of access to a court on account of the owner's failure to follow the contract ADR. The dissent does not explain why an ADR system whose essential purpose is only to keep the contract from being terminated before completion has any relevance after the contract has broken down entirely and years have now gone by.
[8] The contract refers to Claims for Concealed or Unknown Conditions in Article 4.3.4, and presumably these conditions are what the parties refer to by the term hidden condition. Concealed or unknown conditions are defined as: "(1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the contract."